## KOVACS *v.* COOPER, JUDGE.

No. 9.   Submitted October 11, 1948.—Decided January 31, 1949.

*George Pellettieri* submitted on brief for appellant.

*Louis Josephson* submitted on brief for appellee.

Briefs of *amici curiae* urging reversal were filed by *Osmond K. Fraenkel* and *Samuel Rothbard* for the American Civil Liberties Union; and *Lee Pressman, Frank Donner, M. H. Goldstein, Isadore Katz, Irving J. Levy, David Rein* and *Benjamin C. Sigal* for the Congress of Industrial Organizations et al.

Mr. Justice Reed announced the judgment of the Court and an opinion in which The Chief Justice and Mr. Justice Burton join.

This appeal involves the validity of a provision of Ordinance No. 430 of the City of Trenton, New Jersey. It reads as follows:

"4. That it shall be unlawful for any person, firm or corporation, either as principal, agent or employee, to play, use or operate for advertising purposes, or for any other purpose whatsoever, on or upon the public streets, alleys or thoroughfares in the City of Trenton, any device known as a sound truck, loud speaker or sound amplifier, or radio or phonograph with a loud speaker or sound amplifier, or any other instrument known as a calliope or any instrument of any kind or character which emits therefrom loud and raucous noises and is attached to and upon any vehicle operated or standing upon said streets or public places aforementioned."

The appellant was found guilty of violating this ordinance by the appellee, a police judge of the City of Trenton. His conviction was upheld by the New Jersey Supreme Court, *Kovacs* v. *Cooper,* 135 N. J. L. 64, 50 A. 2d 451, and the judgment was affirmed without a majority opinion by the New Jersey Court of Errors and Appeals in an equally divided court. The dissents are printed. 135 N. J. L. 584, 52 A. 2d 806.

We took jurisdiction [1] to consider the challenge made to the constitutionality of the section on its face and as applied on the ground that § 1 of the Fourteenth Amendment of the United States Constitution was violated because the section and the conviction are in con-

---

[1] See Judicial Code § 237 (a), 28 U. S. C. § 344 (a), now 28 U. S. C. § 1257 (2); *Lovell* v. *City of Griffin,* 303 U. S. 444; *New Orleans Water Works Co.* v. *New Orleans,* 164 U. S. 471.

travention of rights of freedom of speech, freedom of assemblage and freedom to communicate information and opinions to others. The ordinance is also challenged as violative of the Due Process Clause of the Fourteenth Amendment on the ground that it is so obscure, vague, and indefinite as to be impossible of reasonably accurate interpretation. No question was raised as to the sufficiency of the complaint.

At the trial in the Trenton police court, a city patrolman testified that while on his post he heard a sound truck broadcasting music. Upon going in the direction of said sound, he located the truck on a public street near the municipal building. As he approached the truck, the music stopped and he heard a man's voice broadcasting from the truck. The appellant admitted that he operated the mechanism for the music and spoke into the amplifier. The record from the police court does not show the purpose of the broadcasting but the opinion in the Supreme Court suggests that the appellant was using the sound apparatus to comment on a labor dispute then in progress in Trenton.

The contention that the section is so vague, obscure and indefinite as to be unenforceable merits only a passing reference. This objection centers around the use of the words "loud and raucous." While these are abstract words, they have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden. Last term, after thorough consideration of the problem of vagueness in legislation affecting liberty of speech, this Court invalidated a conviction under a New York statute construed and applied to punish the distribution of magazines "principally made up of criminal news or stories of deeds of bloodshed or lust, so massed as to become vehicles for inciting violent and depraved crimes against the person." *Winters* v. *New York,* 333 U. S. 507, 518. As thus con-

strued we said that the statute was so vague that an honest distributor of tales of war horrors could not know whether he was violating the statute. P. 520. But in the *Winters* case we pointed out that prosecutions might be brought under statutes punishing the distribution of "obscene, lewd, lascivious, filthy, indecent or disgusting" magazines. P. 511. We said, p. 518:

"The impossibility of defining the precise line between permissible uncertainty in statutes caused by describing crimes by words well understood through long use in the criminal law—obscene, lewd, lascivious, filthy, indecent or disgusting—and the unconstitutional vagueness that leaves a person uncertain as to the kind of prohibited conduct—massing stories to incite crime—has resulted in three arguments of this case in this Court."

We used the words quoted above from page 511 as examples of permissible standards of statutes for criminal prosecution. P. 520. There we said:

"To say that a state may not punish by such a vague statute carries no implication that it may not punish circulation of objectionable printed matter, assuming that it is not protected by the principles of the First Amendment, by the use of apt words to describe the prohibited publications. . . . Neither the states nor Congress are prevented by the requirement of specificity from carrying out their duty of eliminating evils to which, in their judgment, such publications give rise."

We think the words of § 4 of this Trenton ordinance comply with the requirements of definiteness and clarity, set out above.

The scope of the protection afforded by the Fourteenth Amendment, for the right of a citizen to play music and express his views on matters which he considers to be

of interest to himself and others on a public street through sound amplification devices mounted on vehicles, must be considered. Freedom of speech, freedom of assembly and freedom to communicate information and opinion to others are all comprehended on this appeal in the claimed right of free speech. They will be so treated in this opinion.

The use of sound trucks and other peripatetic or stationary broadcasting devices for advertising, for religious exercises and for discussion of issues or controversies has brought forth numerous municipal ordinances. The avowed and obvious purpose of these ordinances is to prohibit or minimize such sounds on or near the streets since some citizens find the noise objectionable and to some degree an interference with the business or social activities in which they are engaged or the quiet that they would like to enjoy.[2] A satisfactory adjustment of the conflicting interests is difficult as those who desire to broadcast can hardly acquiesce in a requirement to modulate their sounds to a pitch that would not rise above other street noises nor would they deem a restriction to sparsely used localities or to hours after work and before sleep—say 6 to 9 p. m.—sufficient for the exercise of their claimed privilege. Municipalities are seeking actively a solution. National Institute of Municipal Law Officers, Report No. 123, 1948. Unrestrained use throughout a municipality of all sound amplifying devices would be intolerable. Absolute prohibition within

---

[2] Ordinances regulating or prohibiting sound devices were upheld in *People* v. *Phillips*, 147 N. Y. Misc. 11, 263 N. Y. Supp. 158; *Maupin* v. *City of Louisville*, 284 Ky. 195, 144 S. W. 2d 237; *Hamilton* v. *City of Montrose*, 109 Colo. 228, 124 P. 2d 757.

Injunctions have also dealt with nuisances from the playing of mechanical music for advertising purposes. *Weber* v. *Mann*, 42 S. W. 2d 492 (Tex. Ct. of Civ. App.); *Stodder* v. *Rosen Talking Machine Co.*, 241 Mass. 245, 135 N. E. 251; 247 Mass. 60, 141 N. E. 569.

municipal limits of all sound amplification, even though reasonably regulated in place, time and volume, is undesirable and probably unconstitutional as an unreasonable interference with normal activities.

We have had recently before us an ordinance of the City of Lockport, New York, prohibiting sound amplification whereby the sound was cast on public places so as to attract the attention of the passing public to the annoyance of those within the radius of the sounds. The ordinance contained this exception:

> "Section 3. Exception. Public dissemination, through radio loudspeakers, of items of news and matters of public concern and athletic activities shall not be deemed a violation of this section provided that the same be done under permission obtained from the Chief of Police."

This Court held the ordinance "unconstitutional on its face," *Saia* v. *New York*, 334 U. S. 558, because the quoted section established a "previous restraint" on free speech with "no standards prescribed for the exercise" of discretion by the Chief of Police. When ordinances undertake censorship of speech or religious practices before permitting their exercise, the Constitution forbids their enforcement.[3] The Court said in the *Saia* case at 560–61:

> "The right to be heard is placed in the uncontrolled discretion of the Chief of Police. He stands athwart the channels of communication as an obstruction which can be removed only after criminal trial and conviction and lengthy appeal. A more effective previous restraint is difficult to imagine."

This ordinance is not of that character. It contains nothing comparable to the above-quoted § 3 of the ordi-

---

[3] *Lovell* v. *City of Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496; *Cantwell* v. *Connecticut,* 310 U. S. 296.

nance in the *Saia* case. It is an exercise of the authority granted to the city by New Jersey "to prevent disturbing noises," N. J. Stat. Ann., tit. 40, § 48–1 (8), nuisances well within the municipality's power to control. The police power of a state extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community.[4] A state or city may prohibit acts or things reasonably thought to bring evil or harm to its people.

In this case, New Jersey necessarily has construed this very ordinance as applied to sound amplification.[5] The Supreme Court said, 135 N. J. L. 64, 66, 50 A. 2d 451, 452:

> "The relevant provisions of the ordinance apply only to (1) vehicles (2) containing an instrument in the nature of a sound amplifier or any other instrument emitting loud and raucous noises and (3) such vehicle operated or standing upon the public streets, alleys or thoroughfares of the city."

If that means that only amplifiers that emit, in the language of the ordinance, "loud and raucous noises" are barred from the streets, we have a problem of regulation. The dissents accept that view.[6] So did the appellant

[4] *Chicago, B. & Q. R. Co.* v. *Drainage Comm'rs,* 200 U. S. 561, 592; *Nebbia* v. *New York,* 291 U. S. 502, 525; *Queenside Hills Realty Co.* v. *Saxl,* 328 U. S. 80, 82.

[5] The Court of Errors and Appeals was cognizant of the difficulties. *Evening Times Printing Co.* v. *American Newspaper Guild,* 124 N. J. Eq. 71, 78, 199 A. 598, 602–603.

[6] 135 N. J. L. 584, 52 A. 2d 809:

"COLIE, J. (For reversal.) I am of the opinion that the judgment under review should be reversed but I do not agree that section 4 of the ordinance is an unconstitutional exercise of the police power. The privilege of a citizen to use the streets for the communication of ideas is not absolute but must be exercised in subordination to the general comfort and convenience. Most assuredly the prohibi-

in his Statement as to Jurisdiction and his brief.[7]  Although this Court must decide for itself whether federal questions are presented and decided,[8] we must accept the

tion against making 'loud and raucous' noises is a reasonable regulation."

*Id.*, at 585: "There is not a scintilla of evidence that the music or voice was loud or raucous, and under the wording of section 4 such proof is an essential prerequisite to a finding of guilt of a violation."

The New Jersey courts may have concluded that the necessity of search by the patrolman to locate the sound truck on a street was sufficient evidence of loudness and raucousness.

135 N. J. L. 584, 52 A. 2d 808, Eastwood, J., for reversal, speaking for himself and three other members, said, pp. 588–89: "It appears to us, and we so hold, that the primary aim of section 4 of the ordinance, under review, is to prohibit 'loud and raucous noises,' at all times and in all places in the City of Trenton, emanating from sound trucks, loud speakers, sound amplifiers, radios or phonographs, equipped with loud speakers or sound amplifiers, or other similar instruments.  It is thus clear that section 4 of the ordinance is not regulatory within a proper exercise of the police power of the municipality."

*Id.*, at 590: "We conclude that section 4 of the ordinance under attack represents an attempt by the municipality under the guise of regulation, to prohibit and outlaw, under all circumstances and conditions, the use of sound amplifying systems."

Perhaps the last-quoted paragraph assumes that all sound trucks emit loud and raucous noises.

[7] He wrote: "Section 4 of the Ordinance, under which appellant was charged, prohibits any person from using for any purpose whatsoever, a loud speaker or sound amplifier which emits therefrom 'loud and raucous noises' and is attached to any vehicle operated or standing upon the streets of the City of Trenton."

In the brief this appears:

"This ordinance does not purport to prohibit loud and raucous noises. It attempts to prohibit sound devices which emit therefrom loud and raucous noises.  This does not validate the ordinance or save it.  In order to be a valid regulation the law must deal with the abuse and not with the use of the thing."

[8] *Lovell* v. *City of Griffin,* 303 U. S. 444, 450.

state courts' conclusion as to the scope of the ordinance.[9]
We accept the determination of New Jersey that § 4
applies only to vehicles with sound amplifiers emitting
loud and raucous noises. Courts are inclined to adopt that
reasonable interpretation of a statute which removes it
farthest from possible constitutional infirmity. *Cox* v.
*New Hampshire*, 312 U. S. 569, 575–76; cf. *United States*
v. *C. I. O.*, 335 U. S. 106, 120. We need not determine
whether this ordinance so construed is regulatory or pro-
hibitory. All regulatory enactments are prohibitory so
far as their restrictions are concerned, and the prohibition
of this ordinance as to a use of streets is merely regulatory.
Sound trucks may be utilized in places such as parks or
other open spaces off the streets. The constitutionality
of the challenged ordinance as violative of appellant's
right of free speech does not depend upon so narrow an
issue as to whether its provisions are cast in the words of
prohibition or regulation.[10] The question is whether or
not there is a real abridgment of the rights of free speech.

Of course, even the fundamental rights of the Bill of
Rights are not absolute. The *Saia* case recognized that
in this field by stating "The hours and place of public

---

[9] *Saia* v. *New York*, 334 U. S. 558; *Cox* v. *New Hampshire*, 312
U. S. 569, 574; *Winters* v. *New York*, 333 U. S. 507, 514.

[10] In the exercise of the police power acts or things which could
not be barred completely from use may be prohibited under some
conditions and circumstances when they interfere with the rights
of others. *Cox* v. *New Hampshire*, 312 U. S. 569, 574; *Chaplinsky*
v. *New Hampshire*, 315 U. S. 568; *Sage Stores Co.* v. *Kansas*, 323 U. S.
32, 36; *Hutchinson Ice Cream Co.* v. *Iowa*, 242 U. S. 153, 159, com-
pare 160; *Powell* v. *Pennsylvania*, 127 U. S. 678, 682–83; *Mugler* v.
*Kansas*, 123 U. S. 623, 657–663. For examples of federal prohibi-
tions, see *Carolene Products Co.* v. *United States*, 323 U. S. 18, 27,
Third; *United States* v. *Darby*, 312 U. S. 100, 113, 116; *Kentucky
Whip & Collar Co.* v. *Illinois Central R. Co.*, 299 U. S. 334, 348;
*Buttfield* v. *Stranahan*, 192 U. S. 470, 492–93.

discussion can be controlled." [11]   It was said decades ago in an opinion of this Court delivered by Mr. Justice Holmes, *Schenck* v. *United States,* 249 U. S. 47, 52, that:

> "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force."

Hecklers may be expelled from assemblies and religious worship may not be disturbed by those anxious to preach a doctrine of atheism. The right to speak one's mind would often be an empty privilege in a place and at a time beyond the protecting hand of the guardians of public order.

While this Court, in enforcing the broad protection the Constitution gives to the dissemination of ideas, has invalidated an ordinance forbidding a distributor of pamphlets or handbills from summoning householders to their doors to receive the distributor's writings, this was on the ground that the home owner could protect himself from such intrusion by an appropriate sign "that he is unwilling to be disturbed." The Court never intimated that the visitor could insert a foot in the door and insist on a hearing. *Martin* v. *Struthers,* 319 U. S. 141, 143, 148. We do not think that the *Struthers* case requires us to expand this interdiction of legislation to include ordinances against obtaining an audience for the broadcaster's ideas by way of sound trucks with loud and raucous noises on city streets. The unwilling listener is

---

[11] *Saia* v. *New York,* 334 U. S. 558, 562; *Prince* v. *Massachusetts,* 321 U. S. 158, 166; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 109; *Cox* v. *New Hampshire,* 312 U. S. 569; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Whitney* v. *California,* 274 U. S. 357, 371, 373; *Reynolds* v. *United States,* 98 U. S. 145, 166.

not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it.[12]  In his home or on the street he is practically helpless to escape this interference with his privacy by loud speakers except through the protection of the municipality.

City streets are recognized as a normal place for the exchange of ideas by speech or paper.  But this does not mean the freedom is beyond all control.  We think it is a permissible exercise of legislative discretion to bar sound trucks with broadcasts of public interest, amplified to a loud and raucous volume, from the public ways of municipalities.  On the business streets of cities like Trenton, with its more than 125,000 people, such distractions would be dangerous to traffic at all hours useful for the dissemination of information, and in the residential thoroughfares the quiet and tranquility so desirable for city dwellers would likewise be at the mercy of advocates of particular religious, social or political persuasions.  We cannot believe that rights of free speech compel a municipality to allow such mechanical voice amplification on any of its streets.

The right of free speech is guaranteed every citizen that he may reach the minds of willing listeners and to do so there must be opportunity to win their attention. This is the phase of freedom of speech that is involved here.  We do not think the Trenton ordinance abridges that freedom.  It is an extravagant extension of due process to say that because of it a city cannot forbid talking on the streets through a loud speaker in a loud and raucous tone.  Surely such an ordinance does not violate our people's "concept of ordered liberty" so as to require federal intervention to protect a citizen from the action of his own local government.  Cf. *Palko* v. *Connecticut,* 302 U. S. 319, 325.  Opportunity to gain the

---

[12] See *Schneider* v. *State,* 308 U. S. 147, 162.

88

public's ears by objectionably amplified sound on the streets is no more assured by the right of free speech than is the unlimited opportunity to address gatherings on the streets.[13]   The preferred position [14] of freedom of speech in a society that cherishes liberty for all does not require legislators to be insensible to claims by citizens to comfort and convenience.   To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself.   That more people may be more easily and cheaply reached by sound trucks, perhaps borrowed without cost from some zealous supporter, is not enough to

---

[13] *Schneider* v. *State,* 308 U. S. 147, 160–61:

"Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated.  So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets.  For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion."

*Cantwell* v. *Connecticut,* 310 U. S. 296, 308:

"When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.  Equally obvious is it that a State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions."

[14] *Thomas* v. *Collins,* 323 U. S. 516, 527, note 12, 530; *Murdock* v. *Pennsylvania,* 319 U. S. 105.

call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open. Section 4 of the ordinance bars sound trucks from broadcasting in a loud and raucous manner on the streets. There is no restriction upon the communication of ideas or discussion of issues by the human voice, by newspapers, by pamphlets, by dodgers. We think that the need for reasonable protection in the homes or business houses from the distracting noises of vehicles equipped with such sound amplifying devices justifies the ordinance.

*Affirmed.*

Mr. Justice Murphy dissents.

Mr. Justice Frankfurter, concurring.

Wise accommodation between liberty and order always has been, and ever will be, indispensable for a democratic society. Insofar as the Constitution commits the duty of making this accommodation to this Court, it demands vigilant judicial self-restraint. A single decision by a closely divided court, unsupported by the confirmation of time, cannot check the living process of striking a wise balance between liberty and order as new cases come here for adjudication. To dispose of this case on the assumption that the *Saia* case, 334 U. S. 558, decided only the other day, was rightly decided, would be for me to start with an unreality. While I am not unaware of the circumstances that differentiate this case from what was ruled in *Saia*, further reflection has only served to reinforce the dissenting views I expressed in that case. *Id.* at 562. In the light of them I conclude that there is nothing in the Constitution of the United States to bar New Jersey from authorizing the City of Trenton to deal in the manner chosen by the City with the aural aggressions implicit in the use of sound trucks.

90

The opinions in this case prompt me to make some additional observations. My brother REED speaks of "the preferred position of freedom of speech," though, to be sure, he finds that the Trenton ordinance does not disregard it. This is a phrase that has uncritically crept into some recent opinions of this Court. I deem it a mischievous phrase, if it carries the thought, which it may subtly imply, that any law touching communication is infected with presumptive invalidity. It is not the first time in the history of constitutional adjudication that such a doctrinaire attitude has disregarded the admonition most to be observed in exercising the Court's reviewing power over legislation, "that it is *a constitution* we are expounding," *M'Culloch* v. *Maryland,* 4 Wheat. 316, 407. I say the phrase is mischievous because it radiates a constitutional doctrine without avowing it. Clarity and candor in these matters, so as to avoid gliding unwittingly into error, make it appropriate to trace the history of the phrase "preferred position." The following is a chronological account of the evolution of talk about "preferred position" except where the thread of derivation is plain enough to be indicated.

1. *Herndon* v. *Lowry,* 301 U. S. 242, 258: "The power of a state to abridge freedom of speech and of assembly is the exception rather than the rule and the penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government. The judgment of the legislature is not unfettered. The limitation upon individual liberty must have appropriate relation to the safety of the state."

2. *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152, n. 4, set forth in the margin.[1] A footnote hardly

[1] "There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments, which are deemed equally specific when held to

seems to be an appropriate way of announcing a new constitutional doctrine, and the *Carolene* footnote did not purport to announce any new doctrine; incidentally, it did not have the concurrence of a majority of the Court. It merely rephrased and expanded what was said in *Herndon* v. *Lowry, supra,* and elsewhere. It certainly did not assert a presumption of invalidity against all legislation touching matters related to liberties protected by the Bill of Rights and the Fourteenth Amendment. It merely stirred inquiry whether as to such matters there

be embraced within the Fourteenth. See *Stromberg* v. *California,* 283 U. S. 359, 369–370; *Lovell* v. *Griffin,* 303 U. S. 444, 452.

"It is unnecessary to consider now whether legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation. On restrictions upon the right to vote, see *Nixon* v. *Herndon,* 273 U. S. 536; *Nixon* v. *Condon,* 286 U. S. 73; on restraints upon the dissemination of information, see *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 713–714, 718–720, 722; *Grosjean* v. *American Press Co.,* 297 U. S. 233; *Lovell* v. *Griffin, supra;* on interferences with political organizations, see *Stromberg* v. *California, supra,* 369; *Fiske* v. *Kansas,* 274 U. S. 380; *Whitney* v. *California,* 274 U. S. 357, 373–378; *Herndon* v. *Lowry,* 301 U. S. 242; and see Holmes, J., in *Gitlow* v. *New York,* 268 U. S. 652, 673; as to prohibition of peaceable assembly, see *De Jonge* v. *Oregon,* 299 U. S. 353, 365.

"Nor need we enquire whether similar considerations enter into the review of statutes directed at particular religious, *Pierce* v. *Society of Sisters,* 268 U. S. 510, or national, *Meyer* v. *Nebraska,* 262 U. S. 390; *Bartels* v. *Iowa,* 262 U. S. 404; *Farrington* v. *Tokushige,* 273 U. S. 284, or racial minorities, *Nixon* v. *Herndon, supra; Nixon* v. *Condon, supra:* whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry. Compare *McCulloch* v. *Maryland,* 4 Wheat. 316, 428; *South Carolina* v. *Barnwell Bros.,* 303 U. S. 177, 184, n. 2, and cases cited."

may be "narrower scope for operation of the presumption of constitutionality" and legislation regarding them is therefore "to be subjected to more exacting judicial scrutiny."

The *Carolene* footnote is cited in *Thornhill* v. *Alabama,* 310 U. S. 88, 95, in an opinion which thus proceeds: "Mere legislative preference for one rather than another means for combatting substantive evils, therefore, may well prove an inadequate foundation on which to rest regulations which are aimed at or in their operation diminish the effective exercise of rights so necessary to the maintenance of democratic institutions. It is imperative that, when the effective exercise of these rights is claimed to be abridged, the courts should 'weigh the circumstances' and 'appraise the substantiality of the reasons advanced' in support of the challenged regulations. *Schneider* v. *State* . . . ."

It is cited again in the opinion of the Court in *A. F. of L.* v. *Swing,* 312 U. S. 321, 325, together with the *Herndon* and *Schneider* cases, in support of the statement that the "right to free discussion" "is to be guarded with a jealous eye."

The *Carolene* footnote was last cited in an opinion of this Court in the passage of *Thomas* v. *Collins,* 323 U. S. 516, 530, quoted below.

(3) *Schneider* v. *State,* 308 U. S. 147, 161: "In every case, therefore, where legislative abridgment of the rights [freedom of speech and of the press] is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances

and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights."

(4) *Bridges* v. *California,* 314 U. S. 252, 262–63: "Moreover, the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be 'substantial,' Brandeis, J., concurring in *Whitney* v. *California, supra,* [274 U. S. 357] 374; it must be 'serious,' *id.* 376. And even the expression of 'legislative preferences or beliefs' cannot transform minor matters of public inconvenience or annoyance into substantive evils of sufficient weight to warrant the curtailment of liberty of expression. *Schneider* v. *State* . . . .

"What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished."

This formulation of the "clear-and-present-danger" test was quoted and endorsed in *Pennekamp* v. *Florida,* 328 U. S. 331, 334.

(5) A number of Jehovah's Witnesses cases refer to the freedoms specified by the First Amendment as in a "preferred position." The phrase was apparently first used in the dissent of Chief Justice Stone in *Jones* v. *Opelika,* 316 U. S. 584, 600, 608. It reappears in *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115; *Prince* v. *Massachusetts,* 321 U. S. 158, 164; *Follett* v. *McCormick,* 321 U. S. 573, 575; *Marsh* v. *Alabama,* 326 U. S. 501, 509; *Saia* v. *New York,* 334 U. S. 558, 562.

(6) *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 639: "The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disap-

pears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect."

(7) *Thomas* v. *Collins,* 323 U. S. 516, 530: "For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation." This is perhaps the strongest language dealing with the constitutional aspect of legislation touching utterance. But it was the opinion of only four members of the Court, since MR. JUSTICE JACKSON, in a separate concurring opinion, referred to the opinion of MR. JUSTICE RUTLEDGE only to say that he agreed that the case fell into "the category of a public speech, rather than that of practicing a vocation as solicitor." *Id.* at 548.

In short, the claim that any legislation is presumptively unconstitutional which touches the field of the First Amendment and the Fourteenth Amendment, insofar as the latter's concept of "liberty" contains what is specifi-

cally protected by the First, has never commended itself to a majority of this Court.

Behind the notion sought to be expressed by the formula as to "the preferred position of freedom of speech" lies a relevant consideration in determining whether an enactment relating to the liberties protected by the Due Process Clause of the Fourteenth Amendment is violative of it. In law also, doctrine is illuminated by history. The ideas now governing the constitutional protection of freedom of speech derive essentially from the opinions of Mr. Justice Holmes.

The philosophy of his opinions on that subject arose from a deep awareness of the extent to which sociological conclusions are conditioned by time and circumstance. Because of this awareness Mr. Justice Holmes seldom felt justified in opposing his own opinion to economic views which the legislature embodied in law. But since he also realized that the progress of civilization is to a considerable extent the displacement of error which once held sway as official truth by beliefs which in turn have yielded to other beliefs, for him the right to search for truth was of a different order than some transient economic dogma. And without freedom of expression, thought becomes checked and atrophied. Therefore, in considering what interests are so fundamental as to be enshrined in the Due Process Clause, those liberties of the individual which history has attested as the indispensable conditions of an open as against a closed society come to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements. Accordingly, Mr. Justice Holmes was far more ready to find legislative invasion where free inquiry was involved than in the debatable area of economics. See my *Mr. Justice Holmes and the Supreme Court,* 58 *et seq.*

The objection to summarizing this line of thought by the phrase "the preferred position of freedom of speech" is that it expresses a complicated process of constitutional adjudication by a deceptive formula. And it was Mr. Justice Holmes who admonished us that "To rest upon a formula is a slumber that, prolonged, means death." Collected Legal Papers, 306. Such a formula makes for mechanical jurisprudence.

Some of the arguments made in this case strikingly illustrate how easy it is to fall into the ways of mechanical jurisprudence through the use of oversimplified formulas. It is argued that the Constitution protects freedom of speech: freedom of speech means the right to communicate, whatever the physical means for so doing; sound trucks are one form of communication; *ergo* that form is entitled to the same protection as any other means of communication, whether by tongue or pen. Such sterile argumentation treats society as though it consisted of bloodless categories. The various forms of modern so-called "mass communications" raise issues that were not implied in the means of communication known or contemplated by Franklin and Jefferson and Madison. Cf. *Associated Press* v. *United States,* 326 U. S. 1. Movies have created problems not presented by the circulation of books, pamphlets, or newspapers, and so the movies have been constitutionally regulated. *Mutual Film Corporation* v. *Industrial Commission,* 236 U. S. 230. Broadcasting in turn has produced its brood of complicated problems hardly to be solved by an easy formula about the preferred position of free speech. See *National Broadcasting Co.* v. *United States,* 319 U. S. 190.

Only a disregard of vital differences between natural speech, even of the loudest spellbinders, and the noise of sound trucks would give sound trucks the constitutional rights accorded to the unaided human voice. Nor is it for this Court to devise the terms on which sound trucks

should be allowed to operate, if at all. These are matters for the legislative judgment controlled by public opinion. So long as a legislature does not prescribe what ideas may be noisily expressed and what may not be, nor discriminate among those who would make inroads upon the public peace, it is not for us to supervise the limits the legislature may impose in safeguarding the steadily narrowing opportunities for serenity and reflection. Without such opportunities freedom of thought becomes a mocking phrase, and without freedom of thought there can be no free society.

MR. JUSTICE JACKSON, concurring.

I join the judgment sustaining the Trenton ordinance because I believe that operation of mechanical sound-amplifying devices conflicts with quiet enjoyment of home and park and with safe and legitimate use of street and market place, and that it is constitutionally subject to regulation or prohibition by the state or municipal authority. No violation of the Due Process Clause of the Fourteenth Amendment by reason of infringement of free speech arises unless such regulation or prohibition undertakes to censor the contents of the broadcasting. Freedom of speech for Kovacs does not, in my view, include freedom to use sound amplifiers to drown out the natural speech of others.

I do not agree that, if we sustain regulations or prohibitions of sound trucks, they must therefore be valid if applied to other methods of "communication of ideas." The moving picture screen, the radio, the newspaper, the handbill, the sound truck and the street corner orator have differing natures, values, abuses and dangers. Each, in my view, is a law unto itself, and all we are dealing with now is the sound truck.

But I agree with MR. JUSTICE BLACK that this decision is a repudiation of that in *Saia* v. *New York,* 334 U. S.

558.   Like him, I am unable to find anything in this record to warrant a distinction because of "loud and raucous" tones of this machine.   The *Saia* decision struck down a more moderate exercise of the state's police power than the one now sustained.   Trenton, as the ordinance reads to me, unconditionally bans all sound trucks from the city streets.   Lockport relaxed its prohibition with a proviso to allow their use, even in areas set aside for public recreation, when and where the Chief of Police saw no objection.   Comparison of this our 1949 decision with our 1948 decision, I think, will pretty hopelessly confuse municipal authorities as to what they may or may not do.

I concur in the present result only for the reasons stated in dissent in *Saia* v. *New York,* 334 U. S. 558, 566.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE concur, dissenting.

The question in this case is not whether appellant may constitutionally be convicted of operating a sound truck that emits "loud and raucous noises."   The appellant was neither charged with nor convicted of operating a sound truck that emitted "loud and raucous noises."   The charge against him in the police court was that he violated the city ordinance "in that he did, on South Stockton Street, in said City, play, use and operate a device known as a sound truck."   The record reflects not even a shadow of evidence to prove that the noise was either "loud or raucous," unless these words of the ordinance refer to any noise coming from an amplifier, whatever its volume or tone.

After appellant's conviction in the police court, the case was taken to the Supreme Court of New Jersey for review.   That court, composed of three judges, stated with reference to the ordinance and charge: "In simple,

unambiguous language it prohibits the use upon the public streets of any device known as a sound truck, loud speaker or sound amplifier. This is the only charge made against the defendant in the complaint." *Kovacs* v. *Cooper,* 135 N. J. L. 64, 69, 50 A. 2d 451, 453–454. That this court construed the ordinance as an absolute prohibition of all amplifiers on any public street at any time and without regard to volume of sound is emphasized by its further statement that "the ordinance leaves untouched the right of the prosecutor to express his views *orally without the aid of an amplifier." Id.* at 66. (Emphasis supplied.) Thus the New Jersey Supreme Court affirmed the conviction on the ground that the appellant was shown guilty of the only offense of which he was charged—speaking through an amplifier on a public street. If as some members of this Court now assume, he was actually convicted for operating a machine that emitted "loud and raucous noises," then he was convicted on a charge for which he was never tried. "It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made." *Cole* v. *Arkansas,* 333 U. S. 196, 201.

Furthermore, when the conviction was later affirmed in the New Jersey Court of Errors and Appeals by an equally divided court, no one of that court's judges who voted to affirm expressed any doubt as to the correctness of the New Jersey Supreme Court's interpretation; indeed those judges wrote no opinion at all. One of the six who voted to reverse did base his judgment on the fact that there was not "a scintilla of evidence that the music or voice was loud or raucous" and that under the wording of the ordinance such proof was essential. *Kovacs* v. *Cooper,* 135 N. J. L. 584, 585, 52 A. 2d 806, 809. In construing the statute as requiring a proof of loud and

raucous noises, the dissenting judge made the initial mistake of the majority of this Court, but he conceded that under this construction of the statute there was a fatal absence of proof to convict. The other five judges who were for reversal concluded that the ordinance represented "an attempt by the municipality under the guise of regulation, to prohibit and outlaw, under all circumstances and conditions, the use of sound amplifying systems." *Kovacs* v. *Cooper, supra* at 590.

It thus appears that the appellant was charged and convicted by interpreting the ordinance as an absolute prohibition against the use of sound amplifying devices. The New Jersey Supreme Court affirmed only on that interpretation of the ordinance. There is no indication whatever that there was a different view entertained by the six judges of the Court of Errors and Appeals who affirmed the conviction. And it strains the imagination to say that the ordinance itself would warrant any other interpretation.

Nevertheless, in this Court the requisite majority for affirmance of appellant's conviction is composed in part of Justices who give the New Jersey ordinance a construction different from that given it by the state courts. That is not all. Affirmance here means that the appellant will be punished for an offense with which he was not charged, to prove which no evidence was offered, and of which he was not convicted, according to the only New Jersey court which affirmed with opinion. At the last term of court we held that the Arkansas Supreme Court had denied an appellant due process because it had failed to appraise the validity of a conviction "on consideration of the case as it was tried and as the issues were determined in the trial court." *Cole* v. *Arkansas, supra* at 202. I am unable to distinguish the action taken by this Court today from the action of the Arkansas Supreme Court which we declared denied a defendant due process of law.

The New Jersey ordinance is on its face, and as construed and applied in this case by that state's courts, an absolute and unqualified prohibition of amplifying devices on any of Trenton's streets at any time, at any place, for any purpose, and without regard to how noisy they may be.

In *Saia* v. *New York,* 334 U. S. 558, we had before us an ordinance of the City of Lockport, New York, which forbade the use of sound amplification devices except with permission of the chief of police. The ordinance was applied to keep a minister from using an amplifier while preaching in a public park. We held that the ordinance, aimed at the use of an amplifying device, invaded the area of free speech guaranteed the people by the First and Fourteenth Amendments. The ordinance, so we decided, amounted to censorship in its baldest form. And our conclusion rested on the fact that the chief of police was given arbitrary power to prevent the use of speech amplifying devices at all times and places in the city without regard to the volume of the sound. We pointed out the indispensable function performed by loud speakers in modern public speaking. We then placed use of loud speakers in public streets and parks on the same constitutional level as freedom to speak on streets without such devices, freedom to speak over radio, and freedom to distribute literature.

In this case the Court denies speech amplifiers the constitutional shelter recognized by our decisions and holding in the *Saia* case. This is true because the Trenton, New Jersey, ordinance here sustained goes beyond a mere prior censorship of all loud speakers with authority in the censor to prohibit some of them. This Trenton ordinance wholly bars the use of all loud speakers mounted upon any vehicle in any of the city's public streets.

In my view this repudiation of the prior *Saia* opinion makes a dangerous and unjustifiable breach in the consti-

tutional barriers designed to insure freedom of expression. Ideas and beliefs are today chiefly disseminated to the masses of people through the press, radio, moving pictures, and public address systems. To some extent at least there is competition of ideas between and within these groups. The basic premise of the First Amendment is that all present instruments of communication, as well as others that inventive genius may bring into being, shall be free from governmental censorship or prohibition. Laws which hamper the free use of some instruments of communication thereby favor competing channels. Thus, unless constitutionally prohibited, laws like this Trenton ordinance can give an overpowering influence to views of owners of legally favored instruments of communication. This favoritism, it seems to me, is the inevitable result of today's decision. For the result of today's opinion in upholding this statutory prohibition of amplifiers would surely not be reached by this Court if such channels of communication as the press, radio, or moving pictures were similarly attacked.

There are many people who have ideas that they wish to disseminate but who do not have enough money to own or control publishing plants, newspapers, radios, moving picture studios, or chains of show places. Yet everybody knows the vast reaches of these powerful channels of communication which from the very nature of our economic system must be under the control and guidance of comparatively few people. On the other hand, public speaking is done by many men of divergent minds with no centralized control over the ideas they entertain so as to limit the causes they espouse. It is no reflection on the value of preserving freedom for dissemination of the ideas of publishers of newspapers, magazines, and other literature, to believe that transmission of ideas through public speaking is also essential to the sound thinking of a fully informed citizenry.

It is of particular importance in a government where people elect their officials that the fullest opportunity be afforded candidates to express and voters to hear their views. It is of equal importance that criticism of governmental action not be limited to criticisms by press, radio, and moving pictures. In no other way except public speaking can the desirable objective of widespread public discussion be assured. For the press, the radio, and the moving picture owners have their favorites, and it assumes the impossible to suppose that these agencies will at all times be equally fair as between the candidates and officials they favor and those whom they vigorously oppose. And it is an obvious fact that public speaking today without sound amplifiers is a wholly inadequate way to reach the people on a large scale. Consequently, to tip the scales against transmission of ideas through public speaking, as the Court does today, is to deprive the people of a large part of the basic advantages of the receipt of ideas that the First Amendment was designed to protect.

There is no more reason that I can see for wholly prohibiting one useful instrument of communication than another. If Trenton can completely bar the streets to the advantageous use of loud speakers, all cities can do the same. In that event preference in the dissemination of ideas is given those who can obtain the support of newspapers, etc., or those who have money enough to buy advertising from newspapers, radios, or moving pictures. This Court should no more permit this invidious prohibition against the dissemination of ideas by speaking than it would permit a complete blackout of the press, the radio, or moving pictures. It is wise for all who cherish freedom of expression to reflect upon the plain fact that a holding that the audiences of public speakers can be constitutionally prohibited is not unrelated to a like prohibition in other fields. And the right to freedom

of expression should be protected from absolute censorship for persons without, as for persons with, wealth and power.  At least, such is the theory of our society.

I am aware that the "blare" of this new method of carrying ideas is susceptible of abuse and may under certain circumstances constitute an intolerable nuisance.  But ordinances can be drawn which adequately protect a community from unreasonable use of public speaking devices without absolutely denying to the community's citizens all information that may be disseminated or received through this new avenue for trade in ideas.  I would agree without reservation to the sentiment that "unrestrained use throughout a municipality of all sound amplifying devices would be intolerable."  And of course cities may restrict or absolutely ban the use of amplifiers on busy streets in the business area.  A city ordinance that reasonably restricts the volume of sound, or the hours during which an amplifier may be used, does not, in my mind, infringe the constitutionally protected area of free speech.  It is because this ordinance does none of these things, but is instead an absolute prohibition of all uses of an amplifier on any of the streets of Trenton at any time that I must dissent.

I would reverse the judgment.

MR. JUSTICE RUTLEDGE, dissenting.

I am in accord with the views expressed by my brother BLACK.  I think it important, however, to point out that a majority here agree with him that the issue presented is whether a state (here a municipality) may forbid all use of sound trucks or amplifying devices in public streets, without reference to whether "loud and raucous noises" are emitted.  Only a minority take the view that the Trenton ordinance merely forbids using amplifying instruments emitting loud and raucous noises.

Yet a different majority, one including that minority and two other justices, sustain the ordinance and its application. In effect Kovacs stands convicted, but of what it is impossible to tell, because the majority upholding the conviction do not agree upon what constituted the crime. How, on such a hashing of different views of the thing forbidden, Kovacs could have known with what he was charged or could have prepared a defense, I am unable to see. How anyone can do either in the future, under this decision, I am equally at loss to say.

In my view an ordinance drawn so ambiguously and inconsistently as to reflect the differing views of its meaning taken by the two groups who compose the majority sustaining it, would violate Fourteenth Amendment due process even if no question of free speech were involved. No man should be subject to punishment under a statute when even a bare majority of judges upholding the conviction cannot agree upon what acts the statute denounces.

What the effect of this decision may be I cannot foretell, except that Kovacs will stand convicted and the division among the majority voting to affirm leaves open for future determination whether absolute and total state prohibition of sound trucks in public places can stand consistently with the First Amendment. For myself, I have no doubt of state power to regulate their abuse in reasonable accommodation, by narrowly drawn statutes, to other interests concerned in use of the streets and in freedom from public nuisance. But that the First Amendment limited its protections of speech to the natural range of the human voice as it existed in 1790 would be, for me, like saying that the commerce power remains limited to navigation by sail and travel by the use of horses and oxen in accordance with the principal modes of carrying on commerce in 1789. The Constitution was not drawn with any such limited vision of time, space

and mechanics. It is one thing to hold that the states may regulate the use of sound trucks by appropriately limited measures. It is entirely another to say their use can be forbidden altogether.

To what has been said above and by MR. JUSTICE BLACK, I would add only that I think my brother FRANK-FURTER demonstrates the conclusion opposite to that which he draws, namely, that the First Amendment guaranties of the freedoms of speech, press, assembly and religion occupy preferred position not only in the Bill of Rights but also in the repeated decisions of this Court.