281 So.2d 706 (1973)
BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY and Agricultural and Mechanical College
v.
James Edward LEWARK and Kathryn Ann Warren.
No. 53513.
Supreme Court of Louisiana.
August 20, 1973.
*707 Phelps, Dunbar, Marks, Claverie & Sims, Edward J. Gay, III, New Orleans, for plaintiff-respondent.
Smith & Scheuermann, Lawrence Blake Jones, New Orleans, for defendants-relators.
SUMMERS, Justice.
We have presented for decision the question: Did the trial court judge abuse his discretion by denying a suspensive appeal from an order granting a permanent injunction in this freedom of the press case?
James Edward Lewark and Kathryn Ann Warren were students at Louisiana State University in New Orleans (LSUNO) and the only two members there of the Revolutionary Communist Youth (RCY). The RCY is the youth section of the Spartacist League, which, according to the testimony, is a Trotsky organization striving to build a revolutionary movement based on politics.
At approximately noon on January 26, 1973 Lewark and Warren were selling literature at a card table they had set up in the north patio of the University Center on the LSUNO Campus. This was an activity they had engaged in from time to time since the preceding October. Some of the printed material they sold was: "Workers Vanguard", a newspaper published by Spartacist Publishing Company of New York City; "Women's Revolution"; "Ruefnick, a Communist Youth News Letter", published by Revolutionary Communist Youth; "Permanent Revolution"; by Leon Trotsky; "Transitional Program" and "Logic of Marxism", published by Pathfinder Press; "Stalinism and BolshevismCritical Remarks on the National Question", "What is Revolutionary Leadership?", "Basic Documents of RCY", "Basic Documents of the Spartacist League", "From Maoism to Trotskyism", "Cuba and Marxism Theory", "Right of Nations to Self-Determination" by Progressive Publishers, Moscow, USSR. Although these publications were sold for a price, Lewark and Warren facetiously concede their business operates in the "Red".
While Lewark and Warren were soliciting sales for this literature, Larry Gracie, University Center Service Coordinator for LSUNO, observed their activity. He approached them and advised them that they were violating the University rules, regulations and procedures. He directed them to cease the proscribed activity.
A discussion ensued in which Lewark and Warren readily conceded they were selling the literature, but they questioned the correctness of Gracie's understanding of the rules and regulations. In the end *708 Lewark and Warren defied Gracie's order and threatened to continue their activity thereafter, charging they were being denied freedom of the press.
The university bylaws and regulations require that "[N]o one connected with the university in any capacity shall use for his own benefit or any other personal purpose any university property of whatever description."
Article 63.3 of the Louisiana Criminal Code provides in part: "No person shall without authority go into or upon or remain in or upon or attempt to go into or upon or remain in or upon any structure..., including public buildings and structures, ... or any part, portion or area thereof, after having been forbidden to do so, either orally or in writing...." And Article 63.4 of the Code provides in part that "[N]o person shall incite, solicit, urge, encourage, exhort, instigate or procure any other person to go into or upon or to remain in or upon any structure, ... including public buildings and structures, ... or any part, portion or area thereof, knowing that such other person has been forbidden to go or remain there, either orally or in writing...."
The university bylaws and regulations further prescribe the procedure for obtaining permission for use of university premises and facilities. Insofar as they are pertinent here, the bylaws and regulations limit permission to student organizations for educational or religious purposes.
When Gracie reported to Louis J. Berndt, Jr., Director of the University Center, the stated intention of Lewark and Warren to continue selling literature in the University Center, Berndt thereafter approached Lewark and Warren and advised them that prior approval of the university authorities was necessary before they could use university facilities for such purposes. The answer was a demand that Berndt not interfere with their activities.
On Sunday, January 28, 1973, Lewark, acting for RCY, sent a letter to the University Chancellor pointing out that stopping them from selling literature in the university center was a direct violation of the First Amendment of the United States Constitution guaranteeing freedom of the press. The letter demanded that all university officials cease their interference.
Following this Edgar E. Burks, Vice Chancellor of Student Affairs, met with Lewark and Warren, explained the rules, regulations, practices and procedures in an effort to prevail upon them to abide by university policies, bylaws and regulations, all to no avail.
In keeping with this attitude, on January 30, 1973, Lewark and Warren circulated a pamphlet on the campus, titled "Trampled" in which they charged the university administration with moving to suppress the right to freedom of speech at LSUNO. The pamphlet quoted the university's policy of "free speech" as outlined in the Student Handbook: "The university recognizes that the student's rights, as a citizen, to speak and write freely must not be abridged or restricted in any way except to permit the university to carry on its academic functions .... Printed matter may be distributed on the campus by students in an orderly manner to those who wish to receive it." The pamphlet charged the policy "is a hoax."
The pamphlet also defined the RCY to be "a revolutionary socialist youth movement which can intervene in all social struggles armed with a working class program based on the politics of Marx, Lenin and Trotsky." Its aims were also set forth: "We work for the formation of a revolutionary vanguard party of the working class to lead the struggle here and internationally for a successful communist revolution, which will lay the basis for forcing the energies of all humanity towards creating a truly free society."
In addition, the pamphlet charged that denying RCY the right to sell literature *709 was an attack on all students and urged the students to demand that no further attempts be made to stop RCY from distributing and selling its literature.
At the same time another letter was directed to the university chancellor advising that RCY would continue to sell the publications of its press and threatened injunctive relief if interfered with.
Believing that RCY planned to resume use of the campus and its facilities and the sale of literature for the purpose of publicly defying the rules, regulations, statutes and practices to provoke a confrontation to cause disruption and interference with the proper and authorized use of the university center and other facilities by students, faculty, members of the staff and others, the university sought, on February 7, 1973, and obtained, a temporary restraining order from the District Court. The order restrained and enjoined Lewark and Warren, the only members of RCY on the campus, from using property of the university for personal purposes and from selling or soliciting the sale on university property of any materials without prior approval.
Another issue was formed by the pleadings when on February 6, 1973 Lewark and Warren purported to act as members of "LSUNO Civil Liberties Defense Committee" in defiance of the Handbook admonition that "Individuals and organizations may not use the university's name or symbols in identifying the publisher of printed matter distributed on the campus without the express authorization of the university." Lewark and Warren subsequently conceded the violation of the university's right to regulate the use of its name, and declared that no reference to the university name or any abbreviated name or acronym would thereafter be used without proper permission. The matter is therefore no longer an issue.
On the trial of the preliminary injunction which followed on February 12, 1973 it was stipulated that the university's application for a permanent injunction be held at the same time and consolidated with the application for a preliminary injunction with one judgment on both.
After trial the injunction was issued; whereupon Lewark and Warren moved for a suspensive appeal which the trial judge denied. An application to the Fourth Circuit for writs under its supervisory jurisdiction to review the order denying a suspensive appeal was also denied for the reason "The showing made by relators does not warrant the exercise of our supervisory jurisdiction."
On further application here, we granted writs to review the denial of the suspensive appeal. Applicants urge that the entire record is relevant to the trial judge's action in denying the suspensive appeal. We agree.
An appeal may be taken as a matter of right from an order or judgment relating to a preliminary or final injunction, but such an order or judgment shall not be suspended during the pendency of an appeal unless the court in its discretion so orders. (Pertinent portion of La.Code Civil P. art. 3612).
Undoubtedly all matters and things which induced the trial judge to grant or deny a suspension of the injunction pending appeal are relevant and should be considered by the reviewing court to determine whether there has been an abuse of the discretion he is authorized by statute to exercise in such matters. Clearly, then, in the absence of a showing to the contrary, all of the evidence considered by the trial judge in granting the injunction had some influence upon the exercise of that discretion. E. g. Standard Import Co. v. New Orleans Import Co., 117 La. 633, 42 So. 192 (1906). Accordingly, we shall consider the entire record as it lay before the trial judge when he refused to suspend the injunction during the appeal.
A question arises in this case at this juncture whether it is proper to review the trial judge's discretion in denying the suspension *710 of the injunction pending appeal. Counsel advises in brief that no appeal has been taken and the time fixed by statute for appeal has expired. See Book III and para. 3, Art. 3612 La.Code Civ.P. However, since the parties have not raised the question, we shall proceed to review the action of the trial judge in the matter.
Evidence shows that these defendants did distribute free literature "quite often" on the campus and in the Union Center without setting up a card table in the patio. No area was restricted to this activity, they understood, so long as the hallways or entrances were not blocked. Moreover, no censorship of free literature by the university authorities was ever attempted or exercised. The university's policy on the subject is fully stated as follows in the Handbook:
The university recognizes that the students' right, as a citizen, to speak and write freely must not be abridged or restricted in any way except to permit the university to carry out its academic functions.
Individuals and organizations may not use the university's name or symbols in identifying the publisher of printed matter distributed on campus without the express authorization of the university.
Printed material may be distributed on the campus by students in an orderly manner to those who wish to receive it. Traffic within and between buildings must not be impeded in any way, nor may there be any interference with the normal operations of the university. Material may not be posted on bulletin boards, walls, or doors except in accordance with the rules established for each building.
In fact, several areas of the University Center are provided where literature may be distributed free and sold upon proper application and authorization. None, however, is permitted to be sold on tables in the area defendants selected.
Actually, these defendants never applied for campus recognition of the right to sell publications. To be entitled to distribute literature for a charge as a student organization, ten members were required. An application, a sponsor, a constitution, bylaws and obligation to make monthly financial reports to university authorities are all requisites to an approved student organization. Since Lewark and Warren were the only members of RCY, they could not qualify. Other groups such as Young Republicans and Young Democrats fulfilled the requirements and sold political literature. A vendor of art prints did likewise. On the other hand, some groups who did not qualify were denied authority.
Reasons advanced for these requirements by the Director of the Union Center indicate these restrictions were necessary to properly utilize the center facilities. Space problems required limiting certain activities. Three thousand meetings were held a year in the center building. A quarter of a million people used the center each year, without considering traffic in the food spots, recreation or other areas designated for specialized use. The center is a public place with people of all walks of life coming and going.
The entire effort of Lewark and Warren and the RCY was admittedly directed toward creating a confrontation with the university on the issue of their claimed unrestricted right to sell literature on the campus, without regard to laws, rules or regulations, or the policies of the university on the subject. They consider themselves revolutionaries and this activity is part of the revolutionary pattern.
Vice Chancellor of Student Affairs, Edgar Burks, explained the policy regarding sale of literature or other materials by individuals or students on the campus. Sponsorship of a chartered student organization is one prerequisite. The requirement is also applicable to off campus individuals or organizations. To permit unrestricted use of university property for the *711 sale of literature or other materials would be to allow any individual to walk onto the campus and set up a card table, a picnic truck, or other conveyance. This and the hauling' of literature, articles for sale, etc., would result in the denial of campus space for the normal conduct of the university's principal function. It would be one huge vending operation.
To confirm this, testimony indicated at least one organization each week has been ordered to cease selling on the campus and to leave. All have obeyed the university rules and policies on the subject. To lift these limitations on vending rights would create a crowded and impossible situation, resulting in wholesale invasion of the campus.
He explained that although distribution of free political literature was permitted, sale was not. Commercial enterprises on campus are not in accordance with the university objectives as an educational institution. As an example of the reprehensible effects of commercialism on campus, he cited the case of a nationwide organization which sells term papers, theses, etc. If they set up a table outside the door of the English class selling term papers, it would be necessary to accord a similar right to all similarly situated or engaged.
The issue, then, resolves itself into whether the requirements imposed by the university, existing by grace of the State, as prerequisites to the sale of political literature on the campus is a violation of freedom of the press as guaranteed by the United States Constitution. If it is, then the trial judge should have granted a suspensive appeal. In fact, he should not have enjoined the selling of literature in the University Center. No action lies to enjoin the exercise of freedom of the press as guaranteed in the First Amendment to the United States Constitution.
The Bill of Rights embody guaranties and immunities which the colonists had inherited from their English ancestors and which from time immemorial had been subject to certain well-recognized exceptions arising from the necessities of the case. Robertson v. Baldwin, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897); Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); Slaughter-House Cases, 16 Wall. (U.S.) 36, 21 L.Ed. 394 (1872). Adopting these principles into our fundamental law was not intended to disregard these exceptions, it being recognized that the exceptions were as valid as though formally expressed in the text of the constitution.
For example, the constitutional right to life and liberty does not prevent the taking of life itself in self-defense or in defense of another under exceptional circumstances. Porter v. Ritch, 70 Conn. 235, 39 A. 169 (1898). The principle is further illustrated by the constitutional guarantee that no person shall be twice put in jeopardy; it does not prevent a second trial when the jury fails to agree on the first if the verdict is set aside on defendant's motion. Robertson v. Baldwin, supra; Brantley v. State, 132 Ga. 573, 64 S.E. 676 (1909). Nor do we feel that freedom of the press insulates a newspaper from the payment of taxes, zoning restrictions or other lawful restrictions or limitations upon its activities. Giragi v. Moore, 48 Ariz. 33, 58 P.2d 1249 (1936); City of Corona v. Corona Daily Independent, 115 Cal.App.2d 382, 252 P.2d 56 (1953), cert, denied, 346 U.S. 833, 74 S.Ct. 2, 98 L.Ed. 356.
An essential element of freedom of the press is its freedom from censorship over what shall be published. The freedom also protects the right to distribute. But these rights also have their limitations. Schwartz v. Edrington, 133 La. 235, 62 So. 660 (1913). Freedom of the press is not an absolute right. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). Thus, the *712 hours and place of public discussion can be constitutionally controlled. Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). And, since freedom of speech is not an unlimited, unqualified right, its societal value must on occasions be subordinated to other values and considerations. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). It would be harsh and arbitrary to enforce freedom of speech or the press in disregard of the rights of others. Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949).
The line between speech unconditionally guaranteed and speech which may be legitimately regulated is finely drawn, and the separation of the two calls for sensitive tools. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1961).
We decide here that no deprivation of freedom of the press has occurred. The limitations upon absolute freedom of the press reflected by the record were indeed minornot difficult of accomplishment or unreasonable under the circumstances. The university facilities were not unlimited, and unlimited use could not be extended to all comers. Somewhere a line had to be drawn.
Since the fundamental right defendants assert is not absolute, it must be exercised in subordination to the general comfort and convenience, consonant with peace and good order and the rights of others. Disruption of orderly university functioning must surely be considered. Lack of limited regulation would hinder education of the student body. This is the result the Vice Chancellor predicts under an unregulated, irresponsible use of university facilities for commercial purposes.
The trial judge properly enjoined defendants and correctly denied a suspensive appeal. The rights of the entire student body and faculty to freedom from defendant's unregulated activity could not be held in abeyance pending the appeal.
For the reasons assigned, the writ is recalled and set aside. The ruling of the trial judge is affirmed.
TATE, J., dissents and assigns reasons.
BARHAM, J., dissents.
DIXON, J., concurs with reasons.
CALOGERO, J., concurs.
DIXON, Justice (concurring).
I concur in the result reached for the sole reason that the defendants have been enjoined only from selling material on the university property. They are not prohibited from otherwise distributing printed material on the campus. They are free to comply with the valid regulations of the university governing the use of university property for the sale of material.
In my view, this is not a "First Amendment" case, but simply a case in which two individuals have refused to abide by reasonable regulations of the university.
TATE, Justice (dissenting).
The narrow issue before us is whether the defendants were entitled to a suspensive appeal from a blanket injunction completely prohibiting them from selling their First-Amendment protected periodical on public property. The very circumstance that since February 12, 1973 this periodical has been barred from circulation on the public campus of a state university shows that, in the absence of a suspensive appeal, First-Amendment rights may be effectively denied and a publication effectively suppressed before any judicial review is available as to the correctness of the initial judgment terminating the periodical's circulation.
Considering the merits as did the majority, I would go further:
In my opinion, it is not within the power of a governmental agency to prohibit the *713 sale on public property of publications presumably clothed with First-Amendment protection.
The issue in this case is not whether commercial activity may be regulated on campus. Here the "commercial" nature of the plaintiff's activities was clearly incidental to the political. Nor is the failure of the plaintiffs to abide by the university regulations the real issue. The majority opinion contends that, had the plaintiffs made proper application to university officials for permission to conduct their activities, permission might have been granted. The First Amendment's application does not depend upon permission of governmental authority.
The issue is not whether the campus will be crowded with vending tables. The blanket injunction issued herein prohibits completely sale on the campus of the publication in question. This, in my opinion, constitutes prior censorship in violation of the First Amendment's protection of a free press.
The real issue here is the right of these students to disseminate their political views to those interested in reading them. If the Times-Picayune or some other great newspaper were barred from being sold on campus, the issue would perhaps be focused more clearly. The issue is nonetheless the same, even though the present publications present only the disfavored opinions of a radical few.
Freedom of the press does not exist only to protect powerful organs of public opinion or politically popular views. In fact, rarely is it necessary for them to call upon the First Amendment for protection. Faithfulness in preservation of First-Amendment rights demands that we enforce the Amendment as well when unpopular views of unread flysheets are under attack. The danger to our constitutional form of government arises not when such views are expressed, but rather when they are suppressed.
I respectfully dissent.