ATTORNEYS FOR APPELLANT
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana

Ashley Tatman Harwel
Heather Hagan McVeigh
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
Paul L. Jefferson
John R. Maley
Sean P. Burke
Indianapolis, Indiana

James Bopp, Jr.
Anita Y. Woudenberg
Terre Haute, Indiana

**FILED**

Dec 29 2011, 11:19 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 07S00-1008-MI-411

STATE OF INDIANA,

*Appellant (Plaintiff below),*

v.

ECONOMIC FREEDOM FUND,
FREEEATS.COM, INC.,
MERIDIAN PACIFIC, INC., AND
JOHN DOES 3–10,

*Appellees (Defendants below).*

Appeal from the Brown Circuit Court, No. 07C01-0609-MI-0425
The Honorable Kenneth G. Todd, Special Judge

On Petition to Transfer Pursuant to Appellate Rule 56(A)

**December 29, 2011**

**David, Justice.**

In this case, the State seeks to enforce a particular provision of the Indiana Autodialer Law against an entity that uses an automated dialing device to deliver prerecorded political mes-

sages. The trial court, on cross-motions for preliminary injunction, decided that the entity had a reasonable likelihood of success on the merits of its claim that the live-operator requirement of the Autodialer Law violates the free speech clause of the Indiana Constitution.

We hold that the entity's First Amendment claim would likely fail. We also hold there is no reasonable likelihood of success on the merits of the entity's claim that the Autodialer Law's live-operator requirement materially burdens its right to engage in political speech in violation of the state constitution.

## Facts and Procedural History

FreeEats.com, Inc. is a provider of prerecorded telephonic messages. It uses an artificially intelligent calling (AIC) system to call residents throughout the United States on behalf of its clients, one of which is the Economic Freedom Fund (EFF). The AIC system can call 1.7 million Indiana residents in seven hours.

The system's prerecorded messages are interactive: they conduct polls, identify political supporters, deliver political-advocacy messages, and encourage voting. These prerecorded messages delivered through automated dialing devices are sometimes referred to as "robocalls."

In early September 2006, FreeEats used its AIC system to disseminate a political message in Indiana for the EFF. A legal battle began soon after, and over the years it has developed a complex procedural history that includes separate state and federal lawsuits.

On September 18, 2006, the State filed a complaint in state court for an injunction, civil penalties, attorneys' fees, and costs against the EFF and ten John Does. The complaint alleged that the defendants had violated Indiana Code section 24-5-14-5(b) (2007), part of the Autodialer Law,[1] in two ways: they made, or caused to be made, robocalls (1) without first obtaining the consent of the subscriber and (2) without using a live operator at the outset of the call to obtain the subscriber's consent before the message was delivered. The same day, and in the same case, the State filed a motion for preliminary injunction.

---

[1] Ind. Code §§ 24-5-14-1 to -13 (2007).

Shortly after, on September 21, 2006, FreeEats filed a complaint in federal district court, seeking declaratory and injunctive relief to prohibit the State and its then Attorney General Steve Carter from enforcing the Autodialer Law. The complaint alleged that federal law preempts the Autodialer Law; the Autodialer Law violates the Commerce Clause and the First Amendment; and the Autodialer Law violates the free speech provision, Article 1, Section 9, of the Indiana Constitution. The next day, the State amended its state-court complaint to substitute FreeEats for John Doe 1, and it also filed a motion for preliminary injunction against FreeEats in state court.

In the ongoing federal case, FreeEats filed a motion for preliminary injunction, and the State and Carter filed a motion to dismiss on abstention grounds. In October 2006, the federal district court denied both motions. FreeEats.com, Inc. v. Indiana ex rel. Carter, No. 1:06-cv-1403-LJM-WTL, 2006 WL 3025810 (S.D. Ind. Oct. 24, 2006). FreeEats appealed.

Meanwhile, the state-court case continued. A significant amount of procedural activity took place from October 2006 until February 2008, including the State substituting Meridian Pacific[2] for John Doe 2.

In the midst of this activity, in September 2007, the Seventh Circuit ruled that the district court should have dismissed the federal case under abstention principles because the State was bringing enforcement proceedings against FreeEats in state court. FreeEats.com, Inc. v. Indiana, 502 F.3d 590, 600 (7th Cir. 2007).

On February 22, 2008, FreeEats filed a motion for preliminary injunction, asking the state court to enjoin the State from enforcing the Autodialer Law against calls that disseminate political messages. FreeEats advanced the same arguments as it did in federal district court: the Autodialer Law is invalid under the First Amendment, the Commerce Clause, and Article 1, Section 9 of the Indiana Constitution, and it is also preempted by federal law. In response, the State filed its second motion for preliminary injunction against FreeEats. These motions remained pending for the next two-plus years for various reasons. Finally, in June 2010, the state court

---

[2] The law firm representing EFF has also represented Meridian Pacific in the proceedings below. EFF's brief on appeal states that "Meridian Pacific, Inc. does not participate in this appeal. . . . Any interests it might have in the outcome of this matter are adequately asserted in this brief by EFF." We note that under Indiana Appellate Rule 17(A), Meridian Pacific is also a party on appeal.

issued an order which granted in part and denied in part FreeEats's motion for preliminary injunction and granted in part and denied in part the State's motion for preliminary injunction.

Specifically, the trial court granted the State's motion as it sought to enforce the Autodialer Law's requirement that FreeEats obtain consent and granted FreeEats's motion as it sought to enjoin the State from requiring FreeEats to hire live operators to obtain that consent. Consequently, the trial court denied FreeEats's request to enjoin the State from enforcing the consent requirement and denied the State's request to enjoin FreeEats from making robocalls without complying with the live-operator requirement.

The trial court ruled that it is permissible under Indiana's free speech provision to require FreeEats to obtain consent before conveying a prerecorded political message using an automated dialing device. But it also ruled that FreeEats was likely to prevail on its claim that the live-operator requirement imposed a material burden on political speech and thus violated Article 1, Section 9 of the Indiana Constitution. In reaching this conclusion, the court found that FreeEats can obtain consent through its automated system more quickly and more cheaply than through a bank of live operators. As to FreeEats's other claims, the trial court stated that "[t]he District Court's analysis and conclusion that FreeEats is unlikely to prevail on the merits of its federal claims is persuasive, but the Court need not address those claims, FreeEats having met its threshold burden under the state constitution."

The State appealed under Indiana Appellate Rule 14(A)(5), which permits parties to take an interlocutory appeal as a matter of right of an order granting or denying a motion for preliminary injunction. FreeEats did not file an appeal. The State then requested, without opposition, that this Court grant immediate transfer under Indiana Appellate Rule 56(A) and expedited consideration under Indiana Appellate Rule 21(B). This Court granted the State's request for immediate transfer but denied its request for expedited consideration. The parties have agreed to a stay of the preliminary injunction pending appeal.

**Standard of Review**

"It is within the sound discretion of the trial court to grant or deny a preliminary injunction[.]" Amoco Prod. Co. v. Laird, 622 N.E.2d 912, 915 (Ind. 1993). Accordingly, this Court's

4

review is limited to whether there was a clear abuse of discretion. Id. An abuse of discretion occurs when the trial court misinterprets the law. Ind. High Sch. Athletic Ass'n, Inc. v. Martin, 731 N.E.2d 1, 5 (Ind. Ct. App. 2000), trans. denied.

## Indiana Autodialer Law

The Indiana Autodialer Law regulates the use of autodialers—devices that select and dial telephone numbers and then disseminate prerecorded messages to those numbers. Ind. Code § 24-5-14-1. Among other things, the law prohibits a caller from using an autodialer without the consent of the recipient of the call. Id. § 24-5-14-5(b). The caller can either obtain consent prior to the call or at the outset of the call by means of a live operator. Id. Certain types of calls are exempt from the consent and live-operator requirements, such as autodialed calls informing employees of work schedules. Id. § 24-5-14-5(a).

This Court has held that the Autodialer Law applies to noncommercial calls, including calls made to communicate purely political messages. State v. American Family Voices, Inc., 898 N.E.2d 293 (Ind. 2008). American Family Voices did not address any "questions as to the extent to which the Autodialer Law limits and may constitutionally limit the use of autodialers to convey political messages" because those questions were not properly before the Court at the time. Id. at 295. Today, however, we are squarely faced with a constitutional challenge to the Autodialer Law.[3]

A. *Threshold Issue and First Amendment Claim*

At the outset, we must determine which claims are properly presented on appeal.

The State and FreeEats each filed a motion for preliminary injunction against the other, and the trial court denied each motion in part. FreeEats did not appeal the trial court's refusal to enjoin the State from enforcing the Autodialer Law's consent provision—whose language re-

---

[3] Although it does not affect today's decision, we note that in September 2011, the U.S. District Court for the Southern District of Indiana determined that Indiana's Autodialer Law is preempted by federal law. Patriotic Veterans, Inc. v. Indiana ex rel. Zoeller, No. 1:10-cv-723-WTL-TAB, 2011 WL 4479071, at *4 (S.D. Ind. Sept. 27, 2011). We further note that the State and Attorney General Gregory F. Zoeller have filed a notice of appeal in that case. Notice of Appeal, Patriotic Veterans, Inc. v. Indiana ex rel. Zoeller, No. 1:10-cv-723-WTL-TAB, 2011 WL 4479071 (S.D. Ind. Oct. 3, 2011), ECF No. 47.

quires FreeEats to obtain consent from the subscriber before delivering prerecorded messages using an automated dialing device. The State, on the other hand, did appeal the trial court's decision to prohibit it from enforcing the Autodialer Law's live-operator provision—whose language would require FreeEats to use live operators if FreeEats chose to obtain consent at the outset of the robocalls. Thus, the sole Autodialer Law provision at issue is the live-operator requirement.

The trial court evaluated the Autodialer Law's live-operator requirement only under Article 1, Section 9 of the Indiana Constitution. As stated above, the trial court never reached any of FreeEats's federal constitutional arguments, but it briefly stated that it found the district court's reasoning that the live-operator requirement did not violate the First Amendment "persuasive." FreeEats[4] argues that if this Court does not affirm the trial court's order on Article 1, Section 9 grounds, then this Court should affirm the order on First Amendment grounds.[5] Essentially, FreeEats presents alternative constitutional arguments: if we determine the Autodialer Law's live-operator requirement does not violate the free speech provision of the state constitution, then we should determine that it *does* violate the free speech provision of the Federal Constitution. We do not believe this alternative federal free speech argument is properly before us.

We recognize the principle that "where a trial court has made special findings pursuant to a party's request under Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings." Mitchell v. Mitchell, 695 N.E.2d 920, 923 (Ind. 1998). Notably, this case involves two facts that take it out of the purview of this principle: first, this Court is not reviewing a judgment but rather an interlocutory order granting a preliminary injunction; and, second, the trial court's special findings were not "pursuant to a party's request" but were mandatory under Indiana Trial Rule 52(A)(1). We believe the first fact is especially significant.

A preliminary injunction is not a final judgment but rather "an extraordinary equitable remedy" that should be granted "in rare instances." Gary Bd. of Zoning Appeals v. Eldridge,

---

[4] FreeEats and the EFF filed separate briefs in this appeal, but their interests are aligned, and their arguments are substantially similar. For ease of discussion, we may now refer to the appellees, collectively, as FreeEats.

[5] FreeEats requests this Court to remand the case back to the trial court to address its other federal constitutional challenges in the event this Court rejects both its state and federal free speech arguments.

774 N.E.2d 579, 584 (Ind. Ct. App. 2002), <u>trans. denied</u>. Furthermore, due to the provisional nature of a preliminary injunction, the record on review is not fully developed. <u>See</u> <u>Jos. Guidone's Food Palace, Inc. v. Palace Pharmacy, Inc.</u>, 252 Ind. 400, 406, 248 N.E.2d 354, 357 (Ind. 1969). Thus, with those considerations in mind, a review of a grant or denial of a preliminary injunction should be confined to the law applied by the trial court, and this Court should evaluate only the merits of arguments reached by the trial court. We find this consistent with the limited and deferential appellate standard of review afforded to trial court rulings on motions for preliminary injunction.

Because we decline to extend the holding from <u>Mitchell</u> to orders granting or denying preliminary injunctions, FreeEats's First Amendment claim is not properly before this Court at this time, as the trial court did not address the merits of that claim. Notwithstanding that fact, we will briefly state why, based on the record before us, FreeEats's First Amendment claim is likely to fail.

To determine the proper standard for evaluating the Autodialer Law under the free speech provision of the First Amendment, we must determine (1) whether the Autodialer Law is content neutral and (2) what type of forum is involved. <u>See</u> <u>Van Bergen v. Minnesota</u>, 59 F.3d 1541, 1550–53 (8th Cir. 1995). A statute similar to the Autodialer Law was challenged on First Amendment grounds in <u>Van Bergen</u>. We find the Eighth Circuit's First Amendment analysis in that case on point.

The United States Supreme Court has provided that "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech.'" <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989) (quoting <u>Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984)). Importantly, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." <u>Id.</u> We find the Autodialer Law content neutral because, with limited exceptions, it applies to all autodialed calls regardless of the call's content. Similar to the exceptions found in the

7

statute in Van Bergen, the exceptions within the Autodialer Law[6] are based on relationships "implying the subscriber's consent to receive the caller's communications." Van Bergen, 59 F.3d at 1550. These relationship-based exceptions do not affect the content neutrality of the Autodialer Law. See id. at 1550–51.

Furthermore, the standards to evaluate limitations on speech "'differ depending on the character of the property at issue.'" Frisby v. Schultz, 487 U.S. 474, 479 (1988) (quoting Perry Educ. Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 44 (1983)). We agree with the comprehensive Van Bergen analysis that "the telephone system is neither a public property nonpublic forum, nor a limited public forum, but a private channel of communication." 59 F.3d at 1553 (finding support from numerous United States Supreme Court cases to reach that conclusion). There is nothing unusual about the use of the telephone system in this case that would compel us to decide this point differently than the Eighth Circuit decided it.

Accordingly, we conclude that the Autodialer Law is content neutral and that the restriction on speech is made through private channels to reach private residences. In these circumstances, the appropriate test for determining whether the Autodialer Law passes muster under the First Amendment is whether it is narrowly tailored to serve a significant governmental interest while leaving open ample alternative channels for communication of the information. Ward, 491 U.S. at 791. We find the Autodialer Law meets this standard and thus does not violate the First Amendment.

We first find that the Autodialer Law serves a significant governmental interest. As this Court stated in American Family Voices, the purpose behind the Autodialer Law "is to protect the privacy, tranquility, and efficiency of telephone customers." 898 N.E.2d at 295. And it is well established that the protection of residential privacy is a significant governmental interest. See, e.g., Frisby, 487 U.S. at 484. The United States Supreme Court has "repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom." Id. at 485.

---

[6] The exceptions within the Autodialer Law include messages "(1) from school districts to students, parents, or employees; (2) to subscribers with whom the caller has a current business or personal relationship; [and] (3) advising employees of work schedules." I.C. § 24-5-14-5(a).

8

Robocalls generate a harm that directly impacts the interest of residential privacy. As aptly stated in Van Bergen, the disruption from robocalls "is evident to anyone who has received such unsolicited calls when busy with other activities." 59 F.3d at 1554. The State notes that "FreeEats has admitted that it can dial more than 1.7 million homes in approximately seven hours and that it might call each home as many as three times before leaving a pre-recorded message on an answering machine at targeted homes."

Furthermore, the Autodialer Law, specifically in regards to its live-operator requirement, is narrowly tailored to serve the interest of residential privacy. "[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." Hill v. Colorado, 530 U.S. 703, 726 (2000). The Autodialer Law prohibits FreeEats from disseminating robocalls when FreeEats has not obtained the subscriber's consent prior to the call or when FreeEats does not use a live operator to obtain the consent at the outset of the call. Thus, FreeEats is free to use its AIC technology once it obtains consent in one of the authorized manners. Importantly, a live operator allows call recipients to decline to listen to the robocalls and request that their residences not be contacted again; in effect, homeowners are empowered to manage the robocalls disseminated to their homes. Thus, while promoting residential privacy, the Autodialer Law does not foreclose the use of AIC technology.

Finally, the statute leaves open ample alternative forms of communication. FreeEats and its clients are free to deliver their messages through various methods, such as robocalls preceded by a live operator at the outset, robocalls when prior consent has been given, direct mail, radio, television, etc. Based on the foregoing considerations, this Court finds that FreeEats is likely to fail on its claim that the Autodialer Law runs afoul of the First Amendment.

B. *Procedural Posture and Article 1, Section 9 Claim*

The State asks this Court to reverse the trial court's denial in part of its motion for preliminary injunction and the trial court's granting in part of FreeEats's motion for preliminary injunction. Essentially, the State's desired outcome is to have this Court determine that the Autodialer Law's live-operator requirement as applied to FreeEats's robocalls comports with Ar-

ticle 1, Section 9 of the Indiana Constitution and accordingly enjoin FreeEats from violating that provision.

Generally, to obtain a preliminary injunction, a party must demonstrate the following four elements by a preponderance of the evidence: (1) there exists a reasonable likelihood of success at trial; (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction. Apple Glen Crossing, LLC v. Trademark Retail, Inc., 784 N.E.2d 484, 487 (Ind. 2003). Due to the procedural posture and nature of this case, two different standards relating to preliminary injunctions apply. But under either of these standards, this Court needs to examine only the trial court's evaluation of the first factor—reasonable likelihood of success at trial.

First, the State is appealing from the trial court's granting in part of FreeEats's motion for preliminary injunction. If FreeEats failed to prove any of the four preliminary injunction requirements, then the trial court's granting in part of its motion was an abuse of discretion. See id. at 487–88. The State asserts that the trial court incorrectly determined that FreeEats had a reasonable likelihood of success on its claim that the Autodialer Law as applied to the robocalls is unconstitutional under Article 1, Section 9. The State does not ask this Court to review the trial court's evaluation of any other preliminary injunction factor.

Second, the State is appealing from the trial court's denial in part of its motion for preliminary injunction. The State asserts that the trial court should have granted its preliminary injunction motion to enjoin FreeEats from making the robocalls without complying with the live-operator requirement of the Autodialer Law. This argument invokes the "per se" injunction standard: if the action to be enjoined clearly violates a statute, the public interest is so great that the injunction should issue regardless of whether a party establishes "irreparable harm" or "greater injury." See Ind. Family & Soc. Servs. Admin. v. Walgreen Co., 769 N.E.2d 158, 161–62 (Ind. 2002). In this case, neither party disputes that the robocalls at issue violate the live-operator provision within the Autodialer Law: at issue is the legality of the provision as applied to the robocalls. Thus we need examine only whether the State is correct in asserting that it had

a reasonable likelihood of success on the merits of its claim—that the Autodialer Law's live-operator requirement as applied to FreeEats's robocalls comports with Article 1, Section 9 of the Indiana Constitution, and thus FreeEats must be enjoined from violating the law.

Under those standards, this Court must evaluate whether either party has a likelihood of success on the merits of its respective claim. We frame the ultimate issue as follows: did the trial court correctly determine that as applied to this case the Autodialer Law's live-operator requirement violates Article 1, Section 9 of the Indiana Constitution?

Indiana Code section 24-5-14-5(b) contains the live-operator provision of the Autodialer Law at sub-subsection (2):

> (b) A caller may not use or connect to a telephone line an automatic dialing-announcing device unless:
>
> > (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or
> >
> > (2) the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered.

Because FreeEats did not have prior consent of the subscribers under sub-subsection (1), sub-subsection (2) requires FreeEats to obtain consent at the outset of the calls through a live operator.

The trial court found that this live-operator requirement imposed a material burden on FreeEats's political speech in violation of Article 1, Section 9 of the Indiana Constitution. The trial court acknowledged that the Autodialer Law in general "does not prohibit FreeEats from making political calls" but found that the live-operator requirement "would increase FreeEats's costs more than tenfold and slow its process of disseminating political messages in Indiana for clients." The State does not dispute that the speech at issue is political in nature but argues that the live-operator requirement does not impose a material burden on the speech.

Article 1, Section 9 of the Indiana Constitution prohibits the legislature from passing laws "restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever." It further states that "for the abuse of that right, every person shall be responsible." Ind. Const. art. 1, § 9. This clause embodies a "freedom-and-

11

responsibility standard," which prohibits the legislature from impairing the flow of ideas but allows it to sanction individuals who commit abuse. Price v. State, 622 N.E.2d 954, 958 (Ind. 1993). Claims that a statute violates the free speech clause of the Indiana Constitution are evaluated under a different standard than claims based on the First Amendment of the U.S. Constitution. See, e.g., id.

For Article 1, Section 9 claims, if a statute affects political speech, which is an established core constitutional value, we engage in "material burden" analysis. Id. at 960, 963. In the present case, there is no dispute that the affected speech is political, as it clearly "comment[s] on government action." Whittington v. State, 669 N.E.2d 1363, 1370 (Ind. 1996). This Court has engaged in "material burden" analysis on several occasions, although in factual scenarios quite different than the present one.

In Price v. State, the seminal case addressing Article 1, Section 9 in the context of political speech, this Court examined the constitutionality of Indiana's disorderly conduct statute. The defendant was arrested and ultimately convicted of disorderly conduct after her noisy protest on how police officers were treating her and other individuals. 622 N.E.2d at 957. The defendant appealed her conviction on several theories—one was that the disorderly conduct statute violated the free speech clause of the state constitution. Id. After determining that the content of the defendant's speech was political, this Court shifted the focus to whether the statute, as applied, imposed a material burden on the speech. Id. at 963. We enunciated several important components of "material burden" analysis. First, "we look only at the magnitude of the impairment." Id. at 961 n.7. "If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired." Id. Second, "treating as abuse political speech which does not harm any particular individual ('public nuisance') does amount to a material burden, but that sanctioning expression which inflicts upon determinable parties harm of a gravity analogous to that required under tort law does not." Id. at 964. With these considerations in mind, we noted that given the ongoing commotion at the time the defendant began shouting her protest at the officers, the State could not establish a link between the defendant's conduct and any particularized harm that was suffered. Id. Any harm suffered by individuals observing the scene was not more than "a fleeting annoyance," and the defendant's actions were not analogous to conduct that "would sustain tort liability against the speaker." Id. In essence, arresting the defendant for dis-

orderly conduct based on her political speech, when her conduct could not be considered abuse under the particular facts, was a material burden on the defendant's right to engage in political speech.

Several cases following Price elaborated on "material burden" analysis. In Whittington, a case also addressing the disorderly conduct statute, this Court stated that "[o]ur opinion in Price suggests that state action does not impose a material burden on expression if either the 'magnitude of the impairment' is slight or the expression threatens to inflict 'particularized harm' analogous to tortious injury on readily identifiable private interests." Whittington, 669 N.E.2d at 1370 (internal citations omitted).[7] And in a case addressing a state statute that imposed certain requirements before a woman could get an abortion, this Court held that "a state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed" but that there is no material burden with a "less than a substantial obstacle" under most circumstances. Clinic for Women, Inc. v. Brizzi, 837 N.E.2d 973, 984 (Ind. 2005).[8]

Thus, determining whether a statute imposes a material burden on political speech may involve two components: "magnitude of the impairment" analysis and "particularized harm" analysis. Under "magnitude of the impairment" analysis, we look at whether there has been a substantial obstacle on the right to engage in political speech. The important inquiry is whether the right to engage in political speech, as affected, no longer serves the purpose for which it was designed. If a substantial obstacle does not exist, there is no material burden on the right to engage in political speech. But if a substantial obstacle does exist, we also engage in "particularized harm" analysis: we look at whether the speaker's actions are analogous to conduct that would sustain tort liability against the speaker. If there is a "particularized harm," then we conclude that the state action does not impose a material burden on the right to engage in political

---

[7] Whittington, like Price, involved a defendant's loud protest during a police investigation and an Article 1, Section 9 challenge to the disorderly conduct statute. Ultimately, unlike Price, the defendant's speech in Whittington was not political, and thus material burden analysis was not appropriate in that case. Whittington, 669 N.E.2d at 1370.

[8] The majority in Clinic for Women left open the issue of whether the right to have an abortion was a core constitutional value under Article 1, Section 1 of the Indiana Constitution. Instead, the majority determined that even if the right to have an abortion were a core constitutional value, the state statute at issue did not impose a material burden on that right. Clinic for Women, 837 N.E.2d at 988.

speech. Conversely, a lack of "particularized harm" means there is a material burden. Ultimately, a material burden on political speech exists only in the presence of a substantial obstacle on the right *and* the absence of particularized harm caused by the speaker.

The State argues (1) that the live-operator requirement's impairment on FreeEats's speech is slight and (2) that FreeEats's robocalls are akin to tort-like conduct. FreeEats, on the other hand, argues that because the live-operator requirement increases its costs and reduces the number of calls it can make within a given period of time, there is a significant impairment on its political expression. Furthermore, FreeEats contends that its robocalls are not excessive enough to be analogous to an actionable tort based on invasion of privacy or the like.

We find that this issue can be resolved on "magnitude of the impairment" grounds and thus find it unnecessary to address the State's argument that the robocalls inflict "particularized harm analogous to tortious injury." For the reasons explained below, we hold that the live-operator requirement of the Autodialer Law does not impose a substantial obstacle on FreeEats's right to engage in political speech.

We agree with the State that FreeEats's right to engage in political speech continues to serve its purpose notwithstanding the live-operator requirement of the Autodialer law. The State elaborates on this argument: (1) the Autodialer Law does not prohibit the dissemination of political speech; (2) FreeEats and its clients may continue to use the AIC system as long as they obtain the residents' consent in either of the prescribed manners; and (3) despite the Autodialer law, FreeEats and its clients are free to broadcast their messages and engage in political discourse in countless other ways.

In Price, the disorderly conduct statute's operation blocked the defendant's ability to engage in political expression. We recognize that an arrest and criminal conviction for nonabusive political speech clearly falls on the substantial-obstacle end of the spectrum. Not every restraint will be as easily definable, and this Court recognizes that lesser restraints may also present substantial obstacles to engage in political speech. But the State has explained why the magnitude of the impairment in this case does not rise to an Article 1, Section 9 violation—the live-operator requirement of the Autodialer Law does not, for various reasons, present a substantial obstacle to the purpose underlying FreeEats's right to engage in political expression. Furthermore,

FreeEats's only substantial-obstacle argument is an economic one—that it is more expensive to make political calls if it complies with the live-operator requirement of the Autodialer Law. This purely economic burden is not the type of substantial obstacle that Price contemplated.

The Autodialer Law prevents FreeEats from sending prerecorded political messages without obtaining the telephone subscriber's consent. FreeEats can obtain this consent prior to the call or at the outset of the call by using a live operator. FreeEats is correct in noting that its costs will increase if it complies with the live-operator requirement, but FreeEats fails to introduce any convincing argument that the result of the requirement is that its right to engage in political expression no longer serves the purpose for which it was designed. Any content-neutral statute that incidentally affects political expression could conceivably increase the economic costs of the speaker. A conclusion that a statute violates the state constitution when it increases the economic costs to engage in political expression, without any showing that the right to political expression no longer serves its purpose, would be unsound. FreeEats and its clients are still free to engage in political expression and are free to use the AIC system to do so. Although the Autodialer Law's live-operator provision is a less-than-ideal requirement for FreeEats, it is not a material burden on its right to engage in political expression.

## Conclusion

We find that the trial court incorrectly found that FreeEats had a reasonable likelihood of success on its claim that the live-operator provision of the Autodialer Law violates Article 1, Section 9 of the Indiana Constitution. Accordingly, we reverse the trial court's granting in part of the preliminary injunction in favor of FreeEats and reverse the trial court's denial in part of the preliminary injunction against the State. We remand to the trial court for further proceedings.

Shepard, C.J., and Dickson and Rucker, JJ., concur.

Sullivan, J., dissents with separate opinion.

15

**Sullivan, Justice, dissenting.**

Like Special Judge Kenneth G. Todd, I believe that application of the live-operator requirement in the present case imposes a material burden on political speech in violation of Art. I, § 9, of the Indiana Constitution.[1]  And I further believe that application of this requirement violates the First Amendment to the United States Constitution.  I therefore respectfully dissent.

**I**

In <u>Price v. State</u>, we held that Art. I, § 9, of the Indiana Constitution enshrines political speech as a core value – one of a cluster of essential values within our Bill of Rights that the Legislature may not "materially burden."  622 N.E.2d 954, 963 (Ind. 1993).  We acknowledged that the same provision contains a responsibility standard, permitting the Legislature to sanction individuals who "abuse" their right to engage in political speech.  <u>Id.</u> at 958.  But we concluded in that case that because Colleen Price's speech – objecting to police conduct – was in fact political and because her conduct could not be considered an abuse under the circumstances, her arrest and criminal conviction for disorderly conduct unconstitutionally burdened her right to engage in political speech.  <u>Id.</u> at 961, 964-65.

As the Court acknowledges, there is no dispute that the speech in this case is political.  In fact, ever since the congressional campaign in 2006, the intention of the Attorney General has been clear – to enforce the Autodialer Law's live-operator requirement against FreeEats's automated political calls and the political speakers using such calls.  <u>See</u> Appellee's App. 303-04 (letters from the Attorney General's office sent in August and September, 2006, to Indiana's political parties informing them of the Autodialer Law's requirements).  The question then is whether the live-operator requirement imposes a material burden on FreeEats's and its clients' rights under the Indiana Constitution to engage in political speech.  Unlike federal constitutional

---

[1] The Court points out that the Autodialer Law has been enjoined by the Federal District Court on preemption grounds.  <u>Patriotic Veterans, Inc. v. State ex rel. Zoeller</u>, ___ F. Supp. 2d ___, No. 1:10-cv-723-WTL-TAB, 2011 U.S. Dist. LEXIS 110787, 2011 WL 4479071 (S.D. Ind. Sept. 27, 2011).  While that issue is not before us in this appeal, FreeEats did plead it in this case and so it will be before Judge Todd on remand.

analysis, our "'[m]aterial burden' analysis involves no . . . weighing nor is it influenced by the social utility of the state action at issue." Price, 622 N.E.2d at 961 n.7. Instead, Price provides two considerations: "state action does not impose a material burden on expression if either the 'magnitude of the impairment' is slight or the expression threatens to inflict 'particularized harm' analogous to tortious injury on readily identifiable private interests." Whittington v. State, 669 N.E.2d 1363, 1370 (Ind. 1996) (internal citations omitted).

With regard to the "magnitude of the impairment," the Court correctly recognizes that the right need not be totally blocked by the restriction; instead, "'a state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed.'" Slip op. at 13 (emphasis added) (citation omitted). But according to the Court, FreeEats has "fail[ed] to introduce any convincing argument that the result of the [live-operator] requirement is that its right to engage in political expression no longer serves the purpose for which it was designed." Id. at 15. The Court says that this is because FreeEats's only substantial-obstacle argument is an economic one and "[t]his purely economic burden is not the type of substantial-obstacle that Price contemplated." Id. at 15.

I disagree for several reasons.

First, although the Court accurately describes the procedural posture of this case, it is incorrect in concluding that the State has met the requisite burden of proof. In Whittington, we explained that the party challenging a state restriction on his or her right to speak[2] bears the burden of proving that the State could not have reasonably concluded that the restricted expression was an abuse, but that the party may meet this burden by showing that the expressive activity was political. 669 N.E.2d at 1369. After making this showing, the burden then shifts to the State to "demonstrate that its action has not materially burdened the claimant's opportunity to engage in political expression." Id. (citing Price, 622 N.E.2d at 963-64). But Price and Whittington were criminal cases. The defendants in each brought Art. I, § 9, challenges to their convictions under the disorderly conduct statute based on their loud protests during police investigations. As

---

[2] The party also bears the initial burden of proving that the State has in fact restricted his or her right to engage in expressive activity. Whittington, 669 N.E.2d at 1367.

2

such, there were genuine issues in those cases as to whether the speech at issue was political at all. In this case, there is – to repeat – no dispute that FreeEats has met its burden of showing that its restricted expression is political; under Price and Whittington, the burden then falls to the State to show that its action is not a material burden. By concluding that FreeEats has "fail[ed] to introduce any convincing argument that the result of the [live-operator] requirement is that its right to engage in political speech no longer serves the purpose for which it was designed," the Court incorrectly places the burden on FreeEats to prove that the live-operator requirement is not a material burden.

Next, the Court's limited view of Price diminishes the protections of Art. I, § 9, and does so with great consequences. As just noted in a different context, both Price and Whittington were challenges to convictions for loudly protesting police conduct. Price therefore did not contemplate or speak to "economic burdens" at all. But in this civil case, the Attorney General seeks to enforce the Autodialer Law's live-operator requirement against a business. In civil cases, economic burdens diminish the protections of Art. I, § 9, in the same way that penal sanctions do in criminal cases. Moreover, the Court fails to appreciate the full extent of the "economic burden" imposed in this case. Unlike the punishment imposed on speech after it was spoken in Price and Whittington, the live-operator requirement prevents political speech from occurring at all. This is because, as discussed more fully below, it eliminates an entire industry offering a specific service to political speakers. In this regard, the live-operator requirement arguably imposes an even greater burden on speech than criminal punishment. Cf. Mishler v. MAC Sys., Inc., 771 N.E.2d 92, 95 (Ind. Ct. App. 2002) (noting "that prior restraints on speech and publication are the most serious and the least tolerable infringement on free speech rights" (citing Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976))).[3]

The consequences of the Court's limited view are even more troubling given what is at stake in this case – a business that provides a service to an unlimited number of groups that wish

---

[3] The term "prior restraint" describes "'administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'" Mishler, 771 N.E.2d at 95 (quoting Alexander v. United States, 509 U.S. 544, 550 (1993)). Classic examples include restraining orders and injunctions that forbid future speech activities. Id. Regardless of whether the live-operator requirement meets the textbook definition of "prior restraint," its effect in this case is comparable in that it prevents speech from occurring altogether.

to engage in efficient, effective political speech and that simultaneously allows a vast number of people to receive that political speech. FreeEats can contact 1.7 million Indiana voters in 7 hours, thereby, as discussed in Part II-B-3, infra, allowing political speakers to deliver their messages during the timeframes in which speech is most effective.[4] It enables candidates to respond to attack ads right before an election when no TV or radio airtime is available, providing candidates what might well be otherwise unavailable opportunities to defend themselves. It educates voters on the issues. It motivates them to turn out. Undoubtedly, it is one of the most important tools in today's political dialogue.

Article I, § 9, prohibits burdens that are material enough to prevent political speech from being delivered – economic or not. Cf. Whittington, 669 N.E.2d at 1368 (noting that the focus of the free speech clause is on the "restrictive impact of state action" and that the clause is triggered when the "state imposes a direct and significant burden on a person's opportunity to speak his or her mind"). The live-operator requirement imposes substantial costs on speakers. The record shows that it costs $0.15 per call without a live operator and $2.25 per call with a live operator – a 1,500% increase in cost. This means that although the market would allow the speaker to disseminate its message to roughly 6,667 potential listeners for $1,000, the State of Indiana requires that the speaker instead spend $15,000 to disseminate the same message to the same listeners – or, in this case, it would have cost FreeEats $900,000 to make its 400,000 calls with a live operator and only $60,000 without a live operator. This burden is so substantial that it eliminates an entire mode of widely used and effective communication from political discourse; it operates to shut down the entire automated political-call industry.

Automated political speech – as an outgrowth of door-to-door political campaigning, political telephone banks, and bulk mailings – is protected under Art. I, § 9. See id. (noting that "because the right to speak clause also provides that expressive activity may be 'freely' performed, the clause reaches every conceivable mode of expression" and that "speaking, writing, or printing, freely, on any subject whatever, includes, at least, the projection of any words in any

---

[4] Live operators, as argued by FreeEats, could not replicate the speed of FreeEats's technology. "If FreeEats were able to hire 200 operators and those operators worked 12-hour days placing an industry standard 20 calls per hour, it would take FreeEats approximately 425 hours, or 35 full-time days, to complete the same task as its [artificial intelligence] system." Appellee FreeEats's Br. 13.

4

manner" (emphasis added)). By way of the live-operator requirement and the resulting elimination of this method of communication, the State is "dictat[ing] the means by which political opinion may be voiced." Price, 622 N.E.2d at 963. Specifically, it is dictating that political opinion may not be voiced through automated political calls. The "magnitude of the impairment" in this case could not be greater.

Finding that the "magnitude of the impairment" is slight, the Court does not address whether the speech at issue "threatens to inflict 'particularized harm' analogous to tortious injury on readily identifiable private interests." Whittington, 669 N.E.2d at 1370 (citation omitted). In any event, these telephone calls do not even come close to violating that standard. First, assuming that the simple act of making a telephone call could even rise to the level of tortious conduct, the calls in this case do not – they are made at reasonable times, are only made up to three times per residence (and only then if the phone was not answered on the first two tries), and are disconnected fairly quickly upon termination of the call. Those who do not want to receive these calls suffer no harm that rises "above the level of a fleeting annoyance." Price, 622 N.E.2d at 964. And, because no one person suffers harm that is different than anyone else, these calls do not inflict "particularized" harm as contemplated by Price. Cf. id. (concluding that the state imposes a material burden when it treats as an abuse political speech which does not harm any particular individual ("public nuisance")). In the absence of particularized harm, the live-operator requirement imposes a material burden on FreeEats's right to engage in political speech in violation of Art. I, § 9, of the Indiana Constitution.

**II**

The First Amendment prohibits the State from "abridging the freedom of speech." U.S. Const. amend. I; McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 336 n.1 (1995). Of course, the right to freedom of speech is not absolute, see, e.g., Schenck v. United States, 249 U.S. 47, 52 (1919) (Holmes, J.), but governmental regulation of expression is permitted only in limited circumstances and only if the regulation satisfies the applicable standard of judicial scrutiny. Cf. United States v. Kokinda, 497 U.S. 720, 725 (1990) (plurality opinion) ("Under our First

5

Amendment jurisprudence, we must determine the level of scrutiny that applies to the regulation of protected speech at issue.").

A

The parties agree that this case involves private individuals or entities attempting to engage in core political speech on private property. But they dispute whether the statute is content based or content neutral.

Content-based laws are those that regulate speech based on its subject matter, its viewpoint, or the speaker's identity. E.g., United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 811-12 (2000). Content-based laws are thus particularly troubling because, at bottom, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972) (citations omitted); see also Turner Broad. Sys., Inc. v. FCC (Turner I), 512 U.S. 622, 641 (1994). As a consequence, content-based regulations of protected speech are subject to the most exacting judicial scrutiny. E.g., Brown v. Entm't Merchs. Ass'n, 564 U.S. ___, 131 S. Ct. 2729, 2738 (2011); Turner I, 512 U.S. at 642.

Content-neutral laws, on the other hand, are those that regulate speech irrespective of subject matter, viewpoint, or speaker identity, and they usually apply to all speech. See, e.g., Members of the Los Angeles City Council v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984); Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 649 (1981). Such laws are deemed to be less problematic under the First Amendment because "they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Turner I, 512 U.S. at 642; see also Geoffrey R. Stone, Content-Neutral Restrictions, 54 U. Chi. L. Rev. 46, 54-57, 72-77 (1987). At the same time, content-neutral speech regulations do burden important First Amendment interests because, by restricting speech, they limit the marketplace of ideas and quell public debate. See, e.g., City of Ladue v. Gilleo, 512 U.S. 43, 55 (1994). To balance these competing interests, the United States Supreme Court has held that content-neutral laws are subject to an intermediate level of scrutiny, which affords the government more leeway in meeting its legiti-

6

mate regulatory objectives.  See Turner I, 512 U.S. at 662; see also Turner Broad. Sys., Inc. v. FCC (Turner II), 520 U.S. 180, 189 (1997); Cox v. New Hampshire, 312 U.S. 569, 574 (1941).

Unsurprisingly, FreeEats argues that the Autodialer Law is content based and that it is subject to heightened judicial scrutiny.  Equally unsurprisingly, the State argues that the law is content neutral and that intermediate scrutiny applies.  I find it is unnecessary to undertake this analysis here because I believe that the live-operator requirement is sufficiently burdensome that it fails intermediate scrutiny.

## B

Intermediate scrutiny is, in the last analysis, a balancing test used to determine whether the State has appropriately balanced its other significant interests against the pertinent First Amendment interests, see Hill v. Colorado, 530 U.S. 703, 714-18 (2000), but it requires more than a simple judicial weighing of interests.  Rather, a content-neutral law will be upheld under intermediate scrutiny only if it is narrowly tailored to serve a substantial governmental interest and leaves open adequate alternative channels of communication.  See id. at 725-30; Turner II, 520 U.S. at 189; Turner I, 512 U.S. at 662; Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Frisby v. Schultz, 487 U.S. 474, 481-82 (1988); City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47 (1986); Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293-94 (1984); Taxpayers for Vincent, 466 U.S. at 804-05; Heffron, 452 U.S. at 647-48; Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976); Grayned v. City of Rockford, 408 U.S. 104, 115-17 (1972); United States v. O'Brien, 391 U.S. 367, 377 (1968).

## B-1

A content-neutral regulation of speech must serve a substantial governmental interest unrelated to the suppression of expression.  E.g., Community for Creative Non-Violence, 468 U.S. at 293-98; O'Brien, 391 U.S. at 377, 380-81.  We acknowledged in State v. American Family Voices, Inc., that the general purpose of the Autodialer Law "is to protect the privacy, tranquili-

7

ty, and efficiency of telephone customers." 898 N.E.2d 293, 295 (Ind. 2008) (citation omitted). And the Supreme Court's cases emphasize that protecting residential privacy is an important interest of the highest magnitude. See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 164-65 (2002); Hill, 530 U.S. at 715-18; Ward, 491 U.S. at 796; Frisby, 487 U.S. at 484-85; Rowan v. U.S. Post Office Dep't, 397 U.S. 728, 736-38 (1970); Kovacs v. Cooper, 336 U.S. 77, 86-87 (1949) (plurality opinion); Martin v. City of Struthers, 319 U.S. 141, 147-48 (1943). But this only begins the analysis, for "[m]ere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." Schneider v. State, 308 U.S. 147, 161 (1939).

## B-2

Under intermediate scrutiny, the speech regulation must be narrowly tailored to serve the government's substantial interest in protecting residential privacy. E.g., Hill, 530 U.S. at 726; Turner I, 512 U.S. at 662; Ward, 491 U.S. at 797-98; Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 477-80 (1989). A law is narrowly tailored if it "promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest." Turner II, 520 U.S. at 213-14 (emphasis added) (citation and internal quotation marks omitted). There are thus two parts to this test: First, the regulation must be effective in achieving the State's substantial regulatory objective. Second, the regulation must not burden substantially more speech than is necessary to achieve its regulatory objective. Accordingly, the Autodialer Law will satisfy this factor if it "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy," Frisby, 487 U.S. at 485, and it will not be invalidated "simply because there is some imaginable alternative that might be less burdensome on speech," United States v. Albertini, 472 U.S. 675, 689 (1985) (citation omitted). Metaphorically speaking, this means that although the State is not required to use a scalpel, it may not use a wrecking ball. And to be sure, a regulation that effectively prohibits speech (by driving up the cost 1,500%) is such a wrecking ball.

8

**B-2-a**

I turn first to five decisions of the United States Supreme Court addressing the constitutionality of content-neutral regulations of speech justified by a governmental interest in protecting privacy.  These cases together stand for the proposition that regulations to protect privacy must be tailored so as to allow unwilling listeners to avoid the speech while allowing willing listeners to receive the speech.  See Watchtower, 536 U.S. 150; Hill, 530 U.S. 703; Frisby, 487 U.S. 474; Martin, 319 U.S. 141; cf. Rowan, 397 U.S. 728.  Regulations intended to protect unwilling listeners are permitted to burden the rights of speakers and willing listeners only where an insurmountable "captive audience" problem exists.  See Ward, 491 U.S. 781; Kovacs, 336 U.S. 77; cf. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 72 (1983) ("The First Amendment 'does not permit the government to prohibit speech as intrusive unless the "captive" audience cannot avoid objectionable speech.'" (citation omitted)).

1.  The ordinance in Martin v. City of Struthers imposed an absolute ban on all door-to-door canvassing and distribution of literature.  319 U.S. at 142.  The Struthers ordinance attempted "to protect the interests of all of its citizens, whether particular citizens want[ed] that protection or not," id. at 143, and thereby substituted "the judgment of the community for the judgment of the individual householder," id. at 144.  The result was that a speaker could be subject "to criminal punishment for annoying the person on whom he call[ed], even though the recipient of the literature distributed [was] in fact glad to receive it."  Id.  The Court held that this went too far by prohibiting too much speech:

> Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved.  The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas.
>
> Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off. . . .  We know of no state which, as does the Struthers ordinance in effect, makes a person a

9

criminal trespasser if he enters the property of another for an innocent purpose without an explicit command from the owners to stay away. The National Institute of Municipal Law Officers has proposed a form of regulation to its member cities which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed. This or any similar regulation leaves the decision as to whether distributers of literature may lawfully call at a home where it belongs – with the homeowner himself. A city can punish those who call at a home in defiance of the previously expressed will of the occupant . . . . In any case, the problem must be worked out by each community for itself with due respect for the constitutional rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributors from the home.

Id. at 146-49 (emphasis added) (footnotes omitted).

2. The ordinance in Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton, did not impose a flat ban on door-to-door canvassing, but it did prohibit door-to-door canvassing without first obtaining a permit from the mayor's office. 536 U.S. at 154. The permit was issued without charge and as a matter of course – it was not a discretionary licensing scheme. Id. at 154-55; cf. Forsyth County v. Nationalist Movement, 505 U.S. 123, 129-33 (1992); Cox v. Louisiana, 379 U.S. 536, 554-58 (1965); Cantwell v. Connecticut, 310 U.S. 296, 305 (1940); Schneider, 308 U.S. at 163-64; Lovell v. City of Griffin, 303 U.S. 444, 451-52 (1938). The Court declined to determine whether the ordinance was content based or content neutral, instead reasoning that "the breadth of speech affected by the ordinance and the nature of the regulation" rendered it invalid under any level of First Amendment scrutiny. Watchtower, 536 U.S. at 164. The Village argued that the ordinance served three interests, including the protection of residential privacy. Id. at 164-65. Although this was an important interest, the Court concluded that the ordinance was not narrowly tailored because another section of the ordinance that allowed residents to post "No Solicitation" signs on their property and "the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors" together provided ample protection for unwilling listeners. Id. at 168 (citation omitted); see also Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 240 F.3d 553, 571 (6th Cir. 2001) (Gilman, J., concurring in part and dissenting in part) (finding under intermediate scrutiny that the ordinance was not narrowly tailored to serve the interest in protecting privacy because there were other ample protections of privacy), rev'd, 536 U.S. 150 (2002).

10

3.  In Frisby v. Schultz, the Court held that an ordinance prohibiting picketing occurring in public streets directed at a single residence or dwelling was not facially invalid under the First Amendment.  487 U.S. at 488.  The Court accepted the view of the lower courts that the ordinance was content neutral and thus subjected it to intermediate scrutiny.  Id. at 482.  The ordinance served a substantial governmental interest in protecting the residential privacy of presumptively unwilling listeners.  Id. at 484-85.  This ban on picketing directed toward a single residence of a presumptively unwilling listener was narrowly tailored because the "evil" of such picketing was "the very presence of an unwelcome visitor at the home," id. at 487 (citation and internal quotation marks omitted), and thus was "created by the medium of expression itself," id. (citation and internal quotation marks omitted).  Moreover, because the scope of the ban was so narrow, ample alternative channels of communication were available.  Id. at 483-84.

4.  In Hill v. Colorado, the Court upheld as a reasonable time, place, or manner regulation a Colorado statute that made it unlawful for a person within 100 feet of a health care facility's entrance to "knowingly approach" within eight feet of another person, without that person's consent, in order to pass that person a leaflet or handbill, to display to that person a sign, or to engage in oral protest, education, or counseling with that person.  530 U.S. at 707, 725.  The Court held that the statute was content neutral, id. at 719-25, and that it served the substantial governmental interest of protecting unwilling listeners' privacy as they sought medical treatment, id. at 715-18.  The statute was narrowly tailored, in large part, because "only attempts to address unwilling listeners [were] affected."  Id. at 727.  Finally, "the 8-foot restriction on an unwanted physical approach [left] ample room to communicate a message through speech" because "[s]igns, pictures, and voice itself [could] cross an 8-foot gap with ease."  Id. at 729.  And the eight-foot restriction applied only within 100 feet of a health care facility, where the restriction was most needed, and thereby interfered far less with speakers' ability to communicate than did the total ban in Frisby or other restrictions previously sustained by the Court.  Id. at 730.

5.  The federal statute at issue in Rowan v. United States Post Office Department allowed postal customers essentially to request that they be placed on a mailer's do-not-mail list – in other words, the statute "was intended to allow the addressee complete and unfettered discretion in

11

electing whether or not he desired to receive further material from a particular sender." 397 U.S. at 734. The Court held that the statute did not violate the First Amendment because, even though the First Amendment protects the speaker's right to communicate, that right "must stop at the mailbox of an unreceptive addressee." Id. at 737. The Court relied heavily on Martin and noted that "the mailer's right to communicate [was] circumscribed only by an affirmative act of the addressee giving notice that he wishe[d] no further mailings from that mailer." Id. Although the statute had "the effect of impeding the flow of ideas, information, and arguments that, ideally, [the addressee] should receive and consider," id. at 736, the Court reasoned that "no one has a right to press even 'good' ideas on an unwilling recipient," id. at 738.

**B-2-b**

The Indiana Autodialer Law is not narrowly tailored because it burdens substantially more speech than is necessary to serve the State's interest in protecting residential privacy. The statute is clearly more akin to the ordinances struck down in Watchtower and Martin; it lacks the narrow tailoring of the laws upheld in Hill, Frisby, and Rowan.

The ordinance in Martin was invalid because it took the majority's view that door-to-door canvassers were undesirable and imposed that view upon the entire community, thereby depriving the individual homeowner of his or her right to determine which messages to consider. 319 U.S. at 147-48. Moreover, in both Martin and Watchtower, there existed alternative means of protecting residential privacy, such as "no trespassing" signs and the unwilling listener's right to refuse to engage in discussion with unwelcome speakers. Watchtower, 536 U.S. at 168; Martin, 319 U.S. at 147-48; see also Sorrell v. IMS Health Inc., 564 U.S. ___, 131 S. Ct. 2653, 2670 (2011) ("Personal privacy even in one's own home receives 'ample protection' from the 'resident's unquestioned right to refuse to engage in conversation with unwelcome visitors.'" (quoting Watchtower, 536 U.S. at 168)).

The challenged laws in Hill, Frisby, and Rowan, on the other hand, were upheld because they protected only unwilling listeners while leaving willing listeners free to receive the speaker's message. Speakers in Hill could obtain a potential listener's consent by asking for it when

12

he or she walked by – it was thus rather simple for a potential listener to opt-out of the statute's protections. 530 U.S. at 726-29; see also id. at 715-16 ("It is also important when conducting this interest analysis to recognize the significant difference between state restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication. This statute deals only with the latter."); id. at 727 (reiterating this point). Conversely, the do-not-mail list upheld in Rowan presumed that potential listeners wanted to receive the speaker's message and those who were unwilling to do so could simply opt-in to the law's protections by requesting the Postmaster General to place their names on a mailer's do-not-mail list. 397 U.S. at 736-38 (discussing the right of the individual householder to exercise exclusive control over unwanted mail). And in Frisby, the Court analyzed the ordinance on the presumption that it would prohibit targeted picketing at an unwilling listener's residence. 487 U.S. at 485 (considering whether the ordinance was "narrowly tailored to protect only unwilling recipients of the communications" (emphasis added)). Indeed, the Court suggested that the ordinance would not apply if such picketing were directed toward the residence of a willing listener. Id. at 488.

The State argues that the consent requirement of Indiana Code section 24-5-14-5(b) is simply an opt-out law of the type approved of in Hill. Hill might apply if section 5 required consent to receive a prerecorded message but imposed no limitation on how such consent could be obtained. But that is not the case. Section 5 imposes a general consent requirement (with a few exemptions) and then proceeds to limit the manner in which consent may be obtained. Consent to hear a prerecorded message can be obtained either through prior interaction with the recipient or through the use of a live operator. As discussed in Part I, supra, the record shows that the live-operator requirement increases the speaker's costs by 1,500%.[5] By doing so, the live-

_____

[5] This critical respect distinguishes this case from the decision in Van Bergen v. Minnesota, 59 F.3d 1541 (8th Cir. 1995). In Van Bergen, the Eighth Circuit upheld under intermediate scrutiny a Minnesota statute almost identical to the Indiana Autodialer Law in a case that, like here, involved core political speech. Id. at 1545-46, 1549-56; see also Bland v. Fessler, 88 F.3d 729 (9th Cir. 1996) (upholding similar California statute as applied to commercial speech); Moser v. FCC, 46 F.3d 970 (9th Cir. 1995) (upholding Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, under intermediate scrutiny). The Eighth Circuit held that the statute was content neutral, that Minnesota had advanced a substantial interest in protecting residential privacy, that the law was narrowly tailored to advance that interest, and that the statute left open ample alternative channels for communication. Van Bergen, 59 F.3d at 1550-56. The panel in Van Bergen expressly rejected the argument that the live-operator requirement imposed an effective ban because it presented "only a marginally more costly option." Id. at 1556. Here, the record shows that the live-operator requirement is far more than "marginally" more expensive.

13

operator requirement effectively eliminates this useful medium of expression altogether. In point of fact, this is the live-requirement's stated purpose. Appellant's App. 14 ("The State concedes that limiting the total volume of automated calls made to Indiana residences is the sole purpose of requiring that consent be obtained by operators instead of an equally capable AIC system.").

This raises another First Amendment issue. Undeniably, any regulation of speech has economic consequences in a broad sense. But in no case has the Supreme Court sustained a law with a financial impact similar to the one required by the Autodialer Law, and it has invalidated laws that subject speech to licensing taxes. See, e.g., Murdock v. Pennsylvania, 319 U.S. 105 (1943) (invalidating ordinance requiring door-to-door canvassers to pay a fee to and obtain a permit from the municipality before conducting its speech activities); Grosjean v. Am. Press Co., Inc., 297 U.S. 233 (1936) (invalidating a state tax levied against newspapers). The only time the Court upheld a time, place, or manner restriction that involved a fee imposed on the speaker in order to speak was in Heffron v. International Society for Krishna Consciousness, Inc., where the state fair rented booths to speakers. 452 U.S. 640 (1981). But the Court noted in a footnote that the propriety of the fee had not been raised and therefore passed no judgment on the issue. Id. at 644 n.4. Moreover, it is reasonable to presume that the fee at issue there was nowhere near the cost imposed on speakers under the Autodialer Law, otherwise it likely would have been challenged.

**B-3**

The statute also fails intermediate scrutiny because it fails to leave open ample and adequate alternative channels of communication. As discussed in Part I, supra, prerecorded messages delivered by autodialers are a relatively inexpensive means of communication that allow speakers to get a message out quickly and effectively to all potential voters. As a result, they have become an extremely popular tool during political campaigns. Indeed, prerecorded messages delivered by autodialers are unique in that they permit speakers to get a message out to particular listeners in a short period of time. And it is well-established that the actual effectiveness and practical utility of the supposed alternative channels of communication must be considered. See Linmark Assocs., Inc. v. Twp. of Willingboro, 431 U.S. 85, 93 (1977).

14

With regard to the importance of the timing of political speech, the Supreme Court has noted the following:

> [T]he public begins to concentrate on elections only in the weeks immediately before they are held. There are short timeframes in which speech can have influence. The need or relevance of the speech will often first be apparent at this stage in the campaign. The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others.

Citizens United v. FEC, 558 U.S. ___, 130 S. Ct. 876, 895 (2010). The means for contributing to political debate, especially leading up to an election, must be able to be mobilized quickly. There are few, if any, substitute media for a speaker to employ in response to an opponent's strategic last-minute attack advertisement. Moreover, important as the commercial media is to our democracy, the advent of the highly competitive 24-hour news cycle arguably has resulted in less reliability in the haste to be the first to "scoop" a potential story that will set a reporter or journalist apart from the rest of the pack. More-traditional methods of speech are therefore unlikely to provide an adequate replacement for prerecorded messages delivered by an autodialer, particularly when the speaker is from outside the State, such as a presidential candidate or an interest group. See generally Jason C. Miller, Note, Regulating Robocalls: Are Automated Calls the Sound of, or a Threat to, Democracy?, 16 Mich. Telecomm. & Tech. L. Rev. 213 (2009), available at http://www.mttlr.org/volsixteen/miller.pdf.

Finally, assuming for the sake of argument that television and radio advertising have the mobility of prerecorded messages delivered by autodialers, those methods of speech have the effect of drowning out candidates and groups with fewer resources. The State is wrong when it argues that "[t]he Supreme Court has been quite clear that, where content-neutral laws are concerned, the relative efficiency of the affected medium of communication is irrelevant." State's Reply Br. 23 (citations omitted). In point of fact, the Supreme Court has often expressed concern about regulations that destroy a particularly useful and inexpensive medium of speech. See, e.g., Watchtower, 536 U.S. at 163-64; Gilleo, 512 U.S. at 57. In striking down the ban on door-to-door canvassing in Martin, the Court reasoned that "[d]oor to door distribution of circulars is

15

essential to the poorly financed causes of little people." 319 U.S. at 146. And in striking down a Colorado statute prohibiting the use of paid petition circulators, the Court wrote the following:

> That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection. Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open "more burdensome" avenues of communication, does not relieve its burden on First Amendment expression. The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for doing so.

Meyer v. Grant, 486 U.S. 414, 424 (1988) (citations omitted).


### Conclusion


I would hold that the Indiana Autodialer Law fails to satisfy the level of intermediate scrutiny applicable to content-neutral laws. And because the statute runs afoul of the First Amendment, it seems to me even clearer that it violates Art. I, § 9, of the Indiana Constitution, for when it comes to political speech, Price v. State provides Hoosiers broader protections than the First Amendment.